260 F.2d 610
 UNITED STATES of America ex rel. Gyula PAKTOROVICS, Relator-Appellant,
v.
John L. MURFF, District Director, Immigration and
Naturalization Service for the District of New
York, Respondent-Appellee.
 No. 274, Docket 24932.
 United States Court of Appeals Second Circuit.
 Argued Feb. 7, 1958.
Decided Nov. 6, 1958.
 
 Edward J. Ennis, New York City (Ralph Goldstein and Clifford Forster, New York City, on the brief), for relator-appellant.
 Roy Babitt, Sp. Asst. U.S. Atty., New York City (Paul W. Williams, U.S. Atty., for the Southern Dist. of New York, New York City, on the brief), for respondent-appellee.
 Before MEDINA, WATERMAN and MOORE, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 This is an appeal from the dismissal of a writ of habeas corpus obtained by appellant, a refugee who fled from Hungary at the time of the Soviet suppression of the revolution which swept his country in the fall of 1956. The writ was sustained as to appellant's wife and two children, but the Government's crossappeal from that determination was voluntarily dismissed.
 
 
 2
 On November 26, 1956, appellant and his family left Budapest for Austria. In Salzburg, Austria, at the request of American Immigration Officers who had interviewed the escapees, appellant executed a written application for himself and his family for parole into the United States pursuant to Section 212(d)(5) of the Immigration and Nationality Act, 8 U.S.C.A. 1182(d)(5). This application was approved and appellant, his wife and two daughters were paroled into the United States. They arrived at Camp Kilmer, New Jersey, on December 24, 1956 and thereafter settled in Baltimore, where appellant obtained employment as a milkman.
 
 
 3
 On February 21, 1957, and on three separate occasions thereafter appellant was interrogated concerning his activities in Hungary, and the circumstances attendant upon his making application for parole into the United States. Three of these interviews were conducted by an investigator for the Immigration and Naturalization Service, and the last one was conducted by an Immigrant Inspector. Each of these interviews was of the question and answer type, with appellant speaking through an interpreter, and at none of them was appellant represented by counsel.
 
 
 4
 As a result of the interrogation in February, 1957 and of those held on March 5, 1957, and July 11, 1957, the immigration officials learned that appellant had been a member of the Communist Party after his release from a concentration camp in 1953. In fact, appellant readily acknowledged this, although the only Party membership noted on his application for parole was during the period from 1947 through 1949. At several times during these interrogations appellant explained that this discrepancy arose because the official in the Consul's office to whom he told the whole story felt it was sufficient of only the first period of his Party membership were listed. This official then filled in the part of appellant's application for parole, entitled 'Political Organizations.' While it is clear to us from an examination of this application that the information regarding Communist Party membership was written by someone other than appellant, the truthfulness of appellant's explanation remains an open question, especially in view of the statement made by appellant at one point in the questioning on July 11, 1957, that he did not mention his Party membership subsequent to his release from the concentration camp on his parole application 'because I knew that if I did not put that in the application I would not have any trouble.'
 
 
 5
 On August 14, 1957, the Acting Regional Commissioner for the Southeast Region revoked appellant's parole on the basis of the alleged concealment and misrepresentation regarding Communist Party membership brought to light by the immigration official's interrogation, and also ordered that 'the necessary steps be taken looking to (appellant's and his family's) return to Austria * * *.' Thereafter appellant was taken into custody by immigration officials, but on August 26, 1957, a writ of habeas corpus seeking a hearing for appellant was allowed by the District Court. On August 27, 1957, appellant appeared before an Immigrant Inspector, who questioned him along the same lines as had the immigration investigator on the three previous occasions. Appellant again stated that he had told officials in Austria of his two periods of membership in the Communist Party and said he had not on July 11, 1957 told the investigator that he had wilfully concealed this information when he was questioned in Austria. He claimed that the interpreter must have mistaken what he did say and thus the translation was incorrect. However, on September 6, 1957, an order that appellant 'be excluded and deported,' without a hearing, was issued on the basis of 'information * * * of a confidential nature, the disclosure of which would be prejudicial to the public interest, safety or security.' Subsequently, on September 13, 1957, this exclusion and deportation was withdrawn since the Acting Regional Commissioner learned that there were 'sufficient bases for the exclusion of (appellant), apart from the confidential information warranting exclusion and deportation without hearing * * *.' Appellant's case was referred to a Special Inquiry Officer for determination of appellant's 'admissibility or excludability.' The writ of habeas corpus allowed on August 26, 1957, was then dismissed upon a stipulation approved the District Court.
 
 
 6
 An exclusion hearing, at which appellant was represented by counsel, was held on September 20, 1957. The proceedings were limited, however, to the question of whether or not appellant had a valid immigration visa. Upon appellant's admission that he had never been in possession of such a visa the Special Inquiry Officer found him to be inadmissible to the United States under Section 212(a)(20) of the Immigration and Nationality Act, 8 U.S.C.A. 1182(a)(20). An appeal from this determination taken to the Board of Immigration Appeals was dismissed on October 22, 1957. A new writ of habeas corpus, allowed on October 26, 1957, was, after argument, dismissed as to appellant by the District Court on November 26, 1957. The appeal now before us was taken from this dismissal of the writ.
 
 
 7
 Thus the facts may be summarized as follows: in order to find some sort of temporary or permanent asylum in the United States, and in response to what must have appeared to them to be a generous and humanitarian invitation from a freedom-loving people, this family of Hungarian refugees came here as parolees. They had no visas when they left Austria, and the United States officials handling the matter knew at all times that they had no visas and were not expected to have any visas. Having raised the issue of whether Gyula Paktorovics had communistic or subversive tendencies, all of which he vigorously denied, the issue of his communist connections was abandoned, and he was ruled to be deportable on the sole ground of his failure to produce the visa which everyone knew all along he did not possess. The wife and the two daughters are to be permitted to remain here; but the husband and father must go. The effect of this ruling, if upheld, may be disastrous to the balance of the 30,000 odd Hungarian paroless, who will then be permitted to remain in the United States only so long as the Government officials, who decided that Paktorovics must go, refrain from making a similar decision as to the others. Moreover, if the Government position is sustained, any one or all of this large number of Hungarians who fled from the might of Soviet Russia must leave our shores on the mere say-so of a Government official, however, unreasonable or capricious this say-so may be, and even if there is no basis whatever for such a ruling. None of them have any visas; and the only hearing to which any of these parolees will be entitled under the law, as thus interpreted, will be a hearing to determine the already obvious fact that they have no visas. We cannot agree that such is the law. Under the special circumstances of the case of these Hungarian refugees, we think their parole may not be revoked without a hearing at which the basis for the discretionary ruling of revocation may be contested on the merits.
 
 
 8
 Appellant argues that Section 212(d)(5), 8 U.S.C.A. 1182(d)(5), in the light of certain sections of the Immigration and Nationality Act, 8 U.S.C.A. 1101 et seq., which do not be their terms provide for a hearing, requires that a hearing be had on the subject of revocation of parole, at least in the case of the Hungarian refugees. He also notes the President's directive of December 1, 1956 referred to in his Message to the Congress on January 31, 1957 which reviews the sad plight of the 'thousands of men, women, and children (who) have fled their homes to escape Communist suppression,' mentions the fact that most of the refugees have been admitted 'only temporarily on an emergency basis,' that some 'may ultimately decide that they should settle abroad,' but 'many will wish to remain in the United States permanently.' In the meantime, the President adds, 'Prompt action by the Congress is needed looking toward the revision and improvement' of the Immigration and Nationality Act. 103 Cong Rec. 1355.
 
 
 9
 Appellant also contends that he is entitled to procedural due process in any event, and thus to a hearing on the subject of revocation of parole, even if we should not adopt his interpretation of Section 212(d)(5), 8 U.S.C.A. 1182(d) (5), pursuant to the terms of which the Hungarian refugees were paroled into this country.[1]
 
 
 10
 The position of the Government, on the other hand, is that this is an exclusion case pure and simple, that the expulsion cases have no bearing on the problem before us, and that it has been held again and again that the parole of a person seeking entry into the United States is nothing more nor less than an 'enlargement' of the place of detention or temporary refuge ashore, for which purpose Ellis Island had long been used, pending determination of an alien's application for admission into the United States. Thus, argues the Government, an alien physically present in the United States on parole is, nevertheless, 'in contemplation of law' still outside this country and subject to the same treatment, after the Attorney General has exercised his discretion to revoke that alien's parole, as is accorded an alien en route from foreign soil. On the basis of this reasoning it is claimed that appellant has no constitutional rights, and is not within the protection of the Due Process Clause of the Fifth Amendment, citing Kaplan v. Tod, 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585, and two lower court cases the holdings of which have been sustained by the recent Supreme Court decision in Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246. Largely on the basis of the decisions just referred to, and the absence of any clause in Section 212(d)(5), 8 U.S.C.A. 1182(d)(5) stating in so many words that a hearing must be had, the Government insists that no hearing other than the barren formality here resorted to need be had in instances where aliens paroled into the United States pursuant to Section 212(d)(5), 8 U.S.C.A. 1182(d)(5), are to be deported after the revocation of the parole by the Attorney General.
 
 
 11
 But we think this case is different. By reason of the circumstances under which the Hungarian refugees were paroled into the United States this case in sui generis. We are mindful of the opening paragraph of the President's Message to the Congress, above referred to:
 
 
 12
 'The eyes of the free world have been fixed on Hungary over the past 2 1/2 months. Thousands of men, women, and children have fled their homes to escape Communist oppression. They seek asylum in countries that are free. Their opposition to Communist tyranny is evidence of a growing resistance throughout the world. Our position of world leadership demands that, in partnership with the other nations of the free world, we be in a position to grant that asylum.'
 
 
 13
 It is well established law that aliens, even those who have entered the United States illegally, are entitled to the full protection of the constitutional requirements of due process in deportation proceedings. Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576; The Japanese Immigrant Case (Yamataya v. Fisher), 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721; see also Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956. The principles underlying those decisions are applicable here, despite the fact that the proceeding is in form one of exclusion rather than expulsion. If this means an extension of the doctrine that aliens as well as citizens are entitled to the protection of procedural due process in deportation proceedings so as to include within the protected class of persons parolees who have come to the United States as have the Hungarian refugees of whom appellant is merely one of thousands, we do not hesitate to take that forward step, in view of all the circumstances of this case to which reference has been made. What makes this case different from other exclusion cases, such as United States ex rel. Knauff v. Shaughnessy,338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317; Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956; Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246, and Rogers v. Quan,357 U.S. 193, 78 S.Ct. 1076, 2 L.Ed.2d 1252, is that Paktorovics was invited here pursuant to the announced foreign policy of the United States as formulated by the President in his directive of December 1, 1956, referred to in his Message to the Congress, of January 31, 1957, from which we have already quoted. Furthermore, the Congress has recently enacted legislation endorsing the extraordinary action of the President with respect to these Hungarian refugees. See Public Law 85-559, 72 Stat. 419 (approved July 25, 1958).
 
 
 14
 True it is that the President has no power to change the law by inviting Paktorovics and the other Hungarian refugees to come here, but this is not to say that the tender of such an invitation and its acceptance by him did not effect a change in the status of Paktorovics sufficient to entitle him to the protection of our Constitution.
 
 
 15
 We also hold that, in order to bring Section 212(d)(5), 8 U.S.C.A. 1182(d)(5), 'into harmony with the Constitution,'[2] a hearing is required prior to the revocation of parole when this section is applied to persons situated in the United States as is appellant in the case at bar. Section 212(d)(5) provides:
 
 
 16
 'The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'
 
 
 17
 We are not persuaded by appellant's argument that the requirement of such a hearing is to be implied from the language of the section merely because hearings have been authorized by regulations promulgated pursuant to the Immigration and Nationality Act as a preliminary to the exercise of discretion by the Attorney General in withholding deportation, suspending deportation, authorizing voluntary departure in lieu of deportation, and adjusting an alien's immigrant status. We find no relation between the hearings authorized by appropriate regulations to aid the Attorney General in exercising his discretion to withhold the deportation of an alien who otherwise is likely to be subjected to physical persecution, Section 243(h), 8 U.S.C.A. 1253(h), or to adjust the status of an alien so as to give that person a more favorable position with reference to the administration of the immigration laws, Sections 244 and 245, 8 U.S.C.A. 1254, 1255, and the hearings sought by appellant as a condition precedent to the Attorney General's exercising his discretion to revoke parole in order to place appellant in a position more amenable to deportation. The Attorney General is given authority to 'establish such regulations * * * as he deems necessary for carrying out his authority' under the Act, Section 103, 8 U.S.C.A. 1103, and the promulgation of regulations providing for a hearing prior to the exercise of discretion under certain sections of the Act does not dispose of the question of whether or not a hearing is required with regard to the matters involved in other sections of the Act with respect to which no such regulations have been formulated.
 
 
 18
 However, the grave constitutional implications of a decision that appellant is not entitled to the hearing he seeks are clear. Were the views advanced by the Government adopted it is difficult to see how the statute, interpreted to authorize deportation of appellant without a hearing on the merits, could satisfy the requirements of due process. Accordingly, since a construction of Section 212(d)(5), 8 U.S.C.A. 1182(d)(5), which requires a hearing on the subject of revocation of parole will remove serious doubt regarding the validity of the statute, we so construe the section and hold that appellant is entitled to a hearing prior to the revocation of his parole. United States v. Witkovich, 353 U.S. 194, 201-202, 77 S.Ct. 779, 1 L.Ed.2d 765; also Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576; Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616.
 
 
 19
 We do not say that the discretion of the courts should be substituted for the discretion to be exercised by the Attorney General as provided by law. We do say that there must be a hearing which will give assurance that the discretion of the Attorney General shall be exercised against a background of facts fairly contested in the open.
 
 
 20
 Reversed and remanded.
 
 
 21
 MOORE, Circuit Judge (dissenting).
 
 
 22
 I dissent.
 
 
 23
 The relator, Gyula Paktorovics, his wife, Szeren Paktorovics, and their two minor daughters were part of a group of some 30,000 Hungarians who had fled to Austria from Hungary at the time of the uprising in the fall of 1956. To relieve Austria of the burden of this large influx, various countries, including the United States, sympathetic to those who were seeking freedom from Communistic oppression offered to receive certain numbers within their borders. Under the Refugee Relief Act, 50 U.S.C.A.Appendix, 1971 et seq. there were only approximately 6,500 visas available for them. The number seeking asylum vastly exceeded this figure. The President, therefore, on December 1, 1956 directed that 'emergency admission should be granted to 15,000 additional Hungarians through the exercise by the Attorney General of his discretionary authority under section 212(d)(5) of the Immigration and Nationality Act.'[1] Subsequently others were admitted making the total some 30,000.
 
 
 24
 In Austria the relator executed an application for himself and his family pursuant to 212(d)(5) of the Immigration and Nationality Act (8 U.S.C.A. 1182(d)(5)). The truth or falsity of the relator's statements in this application are immaterial to the decision required here. Suffice it to say that they were adequate to enable him and his family to be included in the group destined for the United States. The family arrived in this country on December 24, 1956, and settled in Baltimore where Gyula obtained employment as a milkman.
 
 
 25
 Because no visas were available beyond the exhausted 6,500, the President relied upon section 212(d)(5) of the Immigration and Nationality Act. Indeed there was no other way in which even temporary admission could have been secured. This section provides in part that the Attorney General may in his discretion parole into the United States temporarily, for emergent reasons, in the public interest, 'any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien, and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled.' The section further provides that thereafter his case shall be 'dealt with in the same manner as that of any other applicant for admission to the United States.'
 
 
 26
 Thus Congress had specifically given to 'the Attorney General' the power 'in his discretion' to 'parole into the United States' but only 'temporarily' and 'for emergent reasons * * * in the public interest' aliens applying for admission. However, Congress with equal clarity declared that 'such parole of such alien shall not be regarded as an admission of the alien.' When the purposes of the parole should have been served, again it was the Attorney General to whose opinion Congress entrusted the decision and the power to return the alien to the custody from which he was paroled.
 
 
 27
 On January 31, 1957 the President sent to the Congress a letter of the same date in which he advised Congress that on November 8, 1956 he had directed that extraordinary measures be taken to expedite the processing of 5,000 Hungarian visa applications under provisions of the Refugee Relief Act. However, by November 29 it was clear that many more persons would have to be admitted, and on December 1, the President directed that emergency admission should be granted to 15,000 additional Hungarians through the exercise by the Attorney General of his discretionary authority, and that when these numbers had been exhausted, the situation be reexamined. The President pointed out that most of the refugees had been admitted 'only temporarily on an emergency basis'; that some might ultimately decide to settle abroad; and that many would wish to remain in the United States permanently. As to them he said: 'Their admission to the United States as parolees, however, does not permit permanent residence or the acquisition of citizenship.' To give them that opportunity he recommended that 'the Congress enact legislation giving the President power to authorize the Attorney General to parole into the United States temporarily, under such conditions as he may prescribe, escapees selected by the Secretary of State who have fled or in the future flee from Communist persecution and tyranny.' To avoid the mass of private immigration bills dealing with hardships in individual cases the President recommended that 'the Attorney General be granted authority, subject to such safeguards as Congress may prescribe, to grant relief from exclusion and expulsion * * *.'
 
 
 28
 The President's letter indicated that the problem in dealing with the Hungarian situation was one for Congressional action. In fact, the President squarely placed the problem of the status of the Hungarian refugees before Congress for action. They were physically present in the United States, and yet only 'temporarily,' and at least 23,500 had no visas or other necessary papers to enable them to become permanent residents or citizens. After much debate a bill (H.R.11033) was finally enacted providing for the admission of paroled Hungarian refugees who have been in the United States for at least two years (72 Stat. 419). Both the Senate and House reports accompanying H.R.11033 and recommending its passage (H.R.Rep.No.1661 and S.Rep.No.1817, 85th Cong., 2d Sess.) singled out as best explaining 'the full purport of the bill' the comments by the bill's sponsor, Representative Feighan of Ohio, made when introducing the bill. The Representative explained that the bill was designed to cover the case of a paroled Hungarian refugee and that its objective was to have him 'regarded as lawfully admitted for permanent residence as of the date of his arrival in the United States.' To achieve this status, inspection and, if necessary, a hearing by special inquiry officer of the Immigration and Naturalization Service, were provided for. The Representative stated that 'obviously, if he is not admissible on these terms, the alien's exclusion and deportation would necessarily follow in accordance with the existing provisions of the Immigration and Nationality Act.' He was clear that his bill did nothing that 'affects the duties, powers and functions of the Attorney General' granted by the Act, and that the bill re-states the substance of existing law-- that a parolee, when returned to the custody of the Immigration Service and found inadmissible under the existing law, has automatically lost his status as a parolee, and is required to be excluded and deported just as any other excludable alien applying for admission to the United States.' Cong.Rec. Vol. 104, No. 31; Feb. 27, 1958; pp. 2676-7.
 
 
 29
 There was, of course, a major inconsistency in using 212(d)(5) as the vehicle for emergency admission because the greater proportion by far of those admitted came in purportedly under this section and not pursuant to visas. In the case now before the Court the relators were not aliens 'applying for admission to the United States.' They came in pursuant to a section which by grace of the sovereign permitted them to do so without complying with any law except that which was being used to sanction their de facto admission, and under the specific condition that parole by the Attorney General should not be regarded as admission of the alien. By act of Congress parole was exclusively within the discretion of the Attorney General and he assigned the task of investigating and screening the person so admitted to the Immigration Service.
 
 
 30
 Commencing in February 1957, officers of the Service conducted several investigations and interrogations of the relator Gyula and came to the conclusion that he had been a volunteer member of the Communist party in Hungary and that he had withheld information of such affiliation because of a fear that such disclosure might result in a denial of his application. Thereafter, the Acting Regional Commissioner of the Service at Richmond, Virginia, entered an order on August 14, 1957 revoking his temporary parole and directing that steps be taken for relator's return to Austria. On August 26, 1957 the relator sought a writ of habeas corpus on the ground that his expulsion was without a hearing, in violation of due process. Prior to the return of the writ, the Service invoked 235(c) of the Immigration Act (8 U.S.C.A. 1225(c)) providing for the expulsion of an alien without a hearing where inadmissibility is based on confidential information which would be inimical to public welfare. Subsequently the Commissioner withdrew the exclusion order on this ground and agreed to grant a hearing pursuant to 236 at which hearing the only question permitted to be litigated was whether the relators were in possession of valid unexpired entry documents. This was a futile proceeding because, of course, the relators had no valid entry documents and could not have obtained them. Had they possessed such papers they would not have had to come in by means of 212(d)(5). An appeal to the Board of Immigration Appeals was an equally vain formality. Upon its rejection of the appeal an exclusion order was entered. The relators challenged the constitutionality of these proceedings by habeas corpus, the main ground being that parole was revoked without a hearing.
 
 
 31
 Initial and instinctive reaction leads to the conclusion that this country, in waiving the entry requirements because of the Hungarian emergency, should grant to these unfortunate people all benefits and privileges to be obtained under our Constitution. However, emotional reaction should not blind us to the fact that our immigration policy has been, and still should be, declared by Congress, and enforced by such officers of government as are so designated by Congress. The Supreme Court recently, in this very field (to be sure by votes of four to three, and thrice by five to four), has had occasion to pass upon cases of even greater hardship than that now presented to us.
 
 
 32
 In United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317, the majority pointed out that 'Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted to an alien only upon such terms as the United States shall prescribe. It must be exercised in accordance with the procedure which the United States provides' (338 U.S. at page 542, 70 S.Ct. at page 312). As to the power to delegate, the court continued: 'Thus the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General. The action of the executive officer under such authority is final and conclusive.' Even if the alien had gained entry into the United States (and 212(d)(5) expressly negates entry) 'it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien' (338 U.S. at page 543, 70 S.Ct. at page 312). In the Knauff case a German bride married to an American soldier in Germany was excluded.
 
 
 33
 In Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956, the Court had to deal with the situation which frequently received comment in the public press of the Rumanian who was on Ellis Island unable to enter the United States and equally unable to return to any other country in the world. After he languished within sight of his hoped-for destination for some twenty-one months his case finally reached the Supreme Court which defined the generosity of Congress toward this alien by saying that the hardship of staying aboard the vessel 'persuaded Congress to adopt a more generous course. By statute it authorized, in cases such as this, aliens' temporary removal from ship to shore. But such temporary harborage, an act of legislative grace, bestows no additional rights. Congress meticulously specified that such shelter ashore 'shall not be considered a landing' * * *. And this Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border' (345 U.S. at page 215, 73 S.Ct. at page 631).
 
 
 34
 As recently as June 16, 1958 the Supreme Court had occasion again to consider the status of parolees in the cases of Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246, and Rogers v. Quan, 357 U.S. 193, 78 S.Ct. 1076, 2 L.Ed.2d 1252. Although the cases involved section 243(h) of the Immigration and Nationality Act dealing with the withholding of deportation of aliens who 'in his opinion' (the Attorney General) would be subject to physical persecution the decisions turned upon whether 'physical presence as a parolee' gave the parolee the status of being 'within the United States.' The Court's conclusion was 'that petitioner's parole did not alter her status as an excluded alien or otherwise bring her 'within the United States' in the meaning of 243(h)' (357 U.S. at page 186, 78 S.Ct. at page 1073). Yet in that case Leng May Ma had been physically present in the United States for many years. Having failed in establishing citizenship by virtue of claiming that her father was a United States citizen, she then alleged that deportation to China would subject her to physical persecution and probable death. The Court noted the law as it was, and apparently still is. 'For over a half century this Court (the Supreme court) has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is phusically within the United States (citing cases)' (357 U.S. at page 188, 78 S.Ct. at page 1074). The Court then faced the question 'whether the granting of temporary parole somehow effects a change in the alien's legal status.' Specifically construing the language of the very section here involved (section 212(d)(5)), the Supreme Court said 'petitioner's concept of the effect of parole certainly finds no support in this statutory language' (357 U.S. at page 188, 78 S.Ct. at page 1074).
 
 
 35
 The majority argues that the fact that the relator was paroled into this country at the behest of the executive department makes this case different or 'sui generis.' But all parolees by definition are given that status only through the exercise of the executive department's discretion or its 'invitation,' to use the terminology of the majority. The parole here was granted pursuant to the same statutory authorization as in Leng May Ma, supra, and is no different in principle than the one involved in that case where the Supreme Court showed its consciousness of this situation by noting that 'The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court' (357 U.S. at page 190, 78 S.Ct. at page 1075).
 
 
 36
 In my opinion, the majority in not hesitating 'to take that forward step' namely, to hold 'that aliens (such as relator here) as well as citizens are entitled to the protection of procedural due process in deportation proceedings so as to include within the protected class of persons parolees who have come to the United States as have the Hungarian refugees of whom appellant is merely one of thousands * * *' has undertaken (1) to override the enactments and intent of Congress; (2) to substitute its judgment for the opinion of the Executive branch of Government; and (3) to overrule the long line of consistent decisions of the Supreme Court on this very subject. The effect of the decision is to remove such aliens from the parole of the Attorney General and without Congressional sanction to place it in the courts.
 
 
 37
 The creation and administration of international policies including the admission of citizens of other lands to our shores has been vested in the legislative and executive branches of the Government. Wisely so. Chaos would result were international policy to be set ad hoc by individual courts throughout the country. Even eventual decision by the Supreme Court might be in conflict with executive policies in international affairs.
 
 
 38
 In summary, the law is clear both in statute and decision. Relator, as a parolee, in law, has not as yet been admitted. The facts are equally clear. He was admitted 'temporarily' and 'on parole.' The generous gesture of the President brought him here. However, even the Chief Executive lacks the power to annul the laws passed by Congress regulating admission to this country. Thus, for example, the President could not lawfully declare that thousands of aliens could be received as citizens without visas and without complying with the existing laws prerequisite to citizenship. The President recognized this lack of power when he requested Congressional action to clarify or legitimize the situation of these very refugees.
 
 
 39
 The majority holds that a hearing in this case is a constitutional necessity to assure 'that the discretion of the Attorney General shall be exercised against a background of facts contested in the open.' But is this not merely stating that the courts are to determine how the Attorney General should exercise his discretion and to take onto themselves the power to fix the standards for such exercise, a function which is and should be vested in Congress? Thus under the new law (H.R.11033) Congress requires a Hungarian refugee to meet all the qualifications for admission listed in 8 U.S.C.A. 1182, and renders ineligible for admission any refugee who, like Paktorovics, allegedly has been a voluntary member of the Communistic Party in 1954 (8 U.S.C.A. 1182(a)(28)). If the existing statutory criteria have continuously applied to Paktorovics and the other Hungarian refugees and are now governing the outcome of the hearing said by the majority to be Paktorovics' constitutional right, it was unnecessary for Congress to enact the recent legislation. Moreover, any restriction of the benefits of the Act to refugees who have been in this country for two years or more under the rationale of the majority might well be unconstitutional. Furthermore, under the majority's rationale it is difficult to envisage a situation in which a hearing will not turn the proceeding even farther into the exclusive custody of the courts and away from the officer designated by Congress.
 
 
 40
 The sympathy expressed by the majority for the plight of the Hungarian refugees must be universal amongst freedom-loving peoples. This thought is well expressed in the dissent in Leng May Ma, supra. Were a law enacted that no one against his will be returned to a communist governed country, it would undoubtedly reflect national opinion. If persons presently espousing the communist philosophy not only can remain but participate without restriction in our national life and institutions, why should not those who have risked much to come here not remain? If there be spies whose presence would be dangerous, our agencies charged with prosecuting enemies of the country can deal appropriately with such cases. However, would it not be more fitting and just to give equal treatment to nationals of all nations and races? This court had no difficulty in following the laws to the extent of honoring the opinion of the Immigration Department and affirming an order directing the exclusion and the deportation to China of four young men who claimed that return meant physical persecution and probable death.[2] Yet these young men had been here and participated in our economic life much longer than the relator. When, as, and if the Supreme Court decides, as the majority here, that the Hungarian refugees are 'sui generis,' it will not be of much comfort (if any) to Leng May Ma or the other Chinese whose deportation has been ordered.
 
 
 41
 The very reason which moves so many aliens to seek our citizenship is the success in the preservation of the various important freedoms which this nation has had under its Constitution with its division of powers between the Legislative, Executive and Judicial branches. Anomalous, indeed, would it be if, to extend to aliens these advantages, we were to violate these constitutional concepts. Furthermore, as the Supreme Court so aptly pointed out in Leng May Ma to alter by decision the 'parole status, would be quite likely to prompt some curtailment of current parole policy-- an intention we are reluctant to impute to the Congress.'
 
 
 42
 I, therefore, agree completely with the majority in their desire to enable the Hungarian refugees to remain in this country but must disagree that their opinion reflects authoritative law as declared by statute or by decision-- at least at the present moment.
 
 
 43
 The trial court in an able and, in my opinion, accurate analysis of the law has concluded that there has been 'no mamifest abuse of discretion' by the Commissioner and that the writ of habeas corpus be dismissed. I would affirm that decision.
 
 
 
 [1]
 'On December 1, I directed that above and beyond the available visas under the Refugee Relief Act-- approximately 6,500 in all-- emergency admission should be granted to 15,000 additional Hungarians through the exercise by the Attorney General of his discretionary authority under section 212(d)(5) of the Immigration and Nationality Act; and that when these numbers had been exhausted, the situation be reexamined.' Message from the President of the United States to the Congress, January 31, 1957, 103 Cong.Rec. 1355
 
 
 [2]
 The Japanese Immigrant Case (Yamataya v. Fisher), 189 U.S. 86, 101, 23 S.Ct. 611, 615, 47 L.Ed. 721
 
 
 [1]
 Message from the President of the United States to the Congress, January 13, 1957, 103 Cong.Rec. 1355
 
 
 [2]
 United States ex rel. Lue Chow Yee v. Shaughnessy, 2 Cir., 1957, 245 F.2d 874, affirming D.C., 146 F.Supp. 3; Dong Wing Ott v. Shaughnessy, 2 Cir., 1957, 245 F.2d 875, affirming D.C., 142 F.Supp. 379. Both of these decisions were reaffirmed in a rehearing (247 F.2d 769) in which this court explicitly rejected the decision of the District of Columbia Circuit in Quan v. Brownell, 1957, 101 U.S.App.D.C. 229, 248 F.2d 89, reversed sub nom. Rogers v. Quan, supra