Moises GARCIA–MIR, et al.,
Plaintiffs-Appellees,
Cross-Appellants,

v.

Edwin MEESE, III, et al.,
Defendants-Appellants,
Cross-Appellees.

Rafael FERNANDEZ–ROQUE, et al.,
Plaintiffs-Appellees,
Cross-Appellants,

v.

Edwin MEESE, III, et al.,
Defendants-Appellants,
Cross-Appellees.

Nos. 86–8010, 86–8011.

United States Court of Appeals,
Eleventh Circuit.

April 23, 1986.

Nina R. Hickson, Sharon Douglas Stokes, Asst. U.S. Attys., Atlanta, Ga., Lauri Steven Filppu, Deputy Dir., Office of Immigration, Litigation, (Alison R. Drucker, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Barbara V. Tinsley, Asst. U.S. Atty., Atlanta, Ga., for defendants-appellants, cross-appellees.

William Thompson, Atlanta Legal Aid, Dale Schwartz, Myron Kramer, Deborah Ebel, David Webster, Emory Univ. Sch. of Law, Atlanta, Ga., for plaintiffs-appellees, cross-appellants.

Arthur C. Helton, Lawyer Comm. Human Rights, New York City, for amicus curiae, ACLU, et al.

Before VANCE and JOHNSON, Circuit Judges, and ALLGOOD *, Senior District Judge.

JOHNSON, Circuit Judge:

These cases pose the question whether unadmitted aliens properly may claim the protection of the Due Process Clause of the United States Constitution to secure parole revocation hearings. We earlier determined that, for unadmitted aliens, the right to such hearings is not resident in the core values of the Due Process Clause *per se.* We are today asked to determine whether some actionable liberty interest exists, not based on a core value, which is nonetheless protected by the Fifth Amendment's guarantee of due process of law. For the reasons explained herein, we find it unnecessary to reach that question within the confines of this controversy. It is our opinion that, assuming that undocumented aliens may have actionable nonconstitutionally-based liberty interests, these particular aliens have not stated a viable claim for

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

relief under the Due Process Clause. We also determine that customary international law does not afford these aliens a remedy in American courts.

## I.

This is an appeal and cross-appeal from the final decision of the trial court ordering the government to prepare and implement a plan to provide individual parole revocation hearings for unadmitted aliens.[1] The appellees-cross appellants ["appellees" or "aliens" or "Mariels"] are a certified class of Mariel Cuban refugees who were accorded a special immigration parole status by the Refugee Education Assistance Act of 1980, Pub.L. No. 96–422, § 501(e), 94 Stat. 1799 (1980), *reprinted at* 8 U.S.C.A. § 1522 note (1985).[2] The district court has broken the class into two sub-classes. The "First Group" includes those who are guilty of crimes committed in Cuba before the boatlift or who are mentally incompetent. They have never been paroled into this country. The "Second Group" consists of all other Mariels—those who, because there was no evidence of criminal or mental defect, were paroled under the provisions of the general alien parole statute, 8 U.S.C.A. § 1182(d)(5) (1985), but whose parole was subsequently revoked. All are currently detained in the Atlanta Penitentiary.

This case is no stranger to this Court. In *Garcia-Mir v. Smith,* 766 F.2d 1478 (11th Cir.1985) ["*Garcia-Mir I*"], *cert. denied sub nom. Marquez-Medina v. Meese,*

— U.S. ——, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986), we considered the scope and effect of a Status Review Plan promulgated by the Attorney General and its effect on the parole of some class members. In *Fernandez-Roque v. Smith,* 671 F.2d 426 (11th Cir.1982) ["*Fernandez I*"], we considered the jurisdictional issues raised by the issuance of a temporary restraining order preventing the government from deporting the respondents. In *Fernandez-Roque v. Smith,* 734 F.2d 576 (11th Cir. 1984) ["*Fernandez II*"], this Court reversed the trial court's finding that these aliens had a constitutionally-based liberty interest which could be denied only after full hearing. We withheld judgment on and remanded two other questions: whether there might be some nonconstitutionally-based but nonetheless actionable liberty interest; and whether the detention of these respondents was violative of the principles of public international law. *Id.* at 582 n. 10.

Upon remand the trial court found that the respondents had presented an actionable claim of denial of a protected liberty interest. Specifically, the trial court found that actions taken and documents issued by the Executive Branch under the administration of President Jimmy Carter, and a speech given by President Carter before a League of Women Voters chapter to the effect that the Mariels would be welcomed to this country "with open hearts and open arms," 16 *Weekly Comp.Pres.Doc.* 834–35 (May 5, 1980), had the effect of extending

1. The complex factual posture of this case has been set forth amply in several earlier opinions by this Court. *See, e.g., Garcia-Mir v. Meese,* 781 F.2d 1450 (11th Cir.1986); *Garcia-Mir v. Smith,* 766 F.2d 1478 (11th Cir.1985). The general circumstances leading to the "Freedom Flotilla," which resulted in the transporting of almost 125,000 Cuban refugees to the United States, are explained in *United States v. Frade,* 709 F.2d 1387 (11th Cir.1983). These facts need not be repeated here. Facts unique to this particular controversy will be provided as appropriate.

2. The Act defines a "Cuban and Haitian entrant" as:
   (1) any individual granted parole status as a Cuban/Haitian Entrant (Status Pending) or granted any other special status subsequently established under the immigration laws for

nationals of Cuba or Haiti, regardless of the status of the individual at the time assistance or services are provided; and
   (2) any other national of Cuba or Haiti
      (A) who
      (i) was paroled into the United States and has not acquired any other status under the Immigration and Nationality Act;
      (ii) is the subject of exclusion or deportation proceedings under the Immigration and Nationality Act; or
      (iii) has an application pending with the Immigration and Naturalization Service; and
      (B) with respect to whom a final, nonappealable, and legally enforceable order of deportation or exclusion has not been entered.

an "invitation" to the class members to come to this country. Further, the court pointed to the creation of a special immigration classification for the Mariels. Together these two actions were found to have effected limitations on administrative discretion sufficient to create a liberty interest in securing a parole hearing. The Attorney General was directed to furnish within thirty days for the trial court's approval a plan for providing detention hearings. Such hearings were ordered to begin no later than sixty days after the issuance of the trial court's order. *Fernandez-Roque v. Smith*, 622 F.Supp. 887 (N.D.Ga. 1985).

The government then presented this Court with an emergency motion to stay the district court's orders to promulgate and implement a hearing plan and sought a summary reversal on the merits. It also challenged the continued maintenance of this case as a class action in light of our opinion in *Garcia-Mir I*, 766 F.2d at 1487–88 n. 11. In response to these motions, we issued a Memorandum and Order, *Garcia-Mir v. Meese*, 781 F.2d 1450 (11th Cir.1986) ["*Garcia-Mir II*"], in which we denied the government's motion for a stay of the order to prepare a plan, granted the motion to stay implementation of that plan, denied the motion for summary reversal, and ordered this case heard on the merits. We today consider and determine the merits deferred in *Garcia-Mir II*.

## II.

We are asked to determine: A) whether the trial court correctly found a nonconsti-tutionally-based liberty interest; B) whether it correctly held international law inapplicable to this case; and C) whether this matter was properly considered below as a class action.[3] These are questions of law subject to plenary review on appeal. *Bailey v. Carnival Cruise Lines, Inc.*, 774 F.2d 1577, 1578 (11th Cir.1985).

### A. *The Liberty Interest:*

At issue here is the difficult question whether there exists some right, based not on the Constitution but derived from some other source, that rises to the level of a due process liberty interest and accordingly merits protection. The question is made more difficult by the fact that, once we enter the rarefied domain of nonconstitutionally-based due process rights, the appellees here are excludable aliens and hence have virtually no constitutional rights in any event.

#### 1. Due Process:

The Due Process Clause of the Fifth Amendment affords direct protection to certain "core" values. The obvious example is that the government cannot throw a citizen in jail without informing him of the charges and giving him an opportunity for a fair trial.

Beyond the core of the Due Process Clause are certain rights or interests that are not actually resident in the common law notion of due process[4] but which nonetheless cannot be taken away without af-

---

**3.** The appellees also advance two other claims not meriting extensive discussion. First, they argue that, as to the First Group, the trial court was in error in finding no liberty interest in a parole hearing. To the extent that this depends on the public pronouncements of the Executive Branch, it fails for the reasons set forth at Section II A 2). To the extent that this is based on Article 31 of the 1967 Protocol Relating to the Status of Refugees, it fails because, as appellees concede, this claim is contingent on their class asylum claim which we rejected in *Garcia-Mir I*. They filed for *certiorari* on this question and conceded that, if their petition was not granted, this portion of the claim would be foreclosed by *res judicata*. Appellees' Brief at

31 n. 15. The Supreme Court did deny *certiorari sub nom. Marquez-Medina v. Meese*, — U.S. ——, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986).

Second, they argue that the district court was incorrect in not finding the existence of a core liberty interest arising directly from the Fifth Amendment. This was not error. The district court's ruling was compelled by our decision in *Fernandez II*, 734 F.2d at 582, where we rejected this argument. This panel has no power to reconsider that holding. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc*).

**4.** *See* 1 W. Blackstone, Commentaries * 134–35.

segmentsegmentsegment4segment5header**1450**

fording process due. Thus, for example, the state has no obligation to set up a system of "good-time credits" as an incentive for good behavior in the prisons. But if the state chooses to set up such a system and promulgates rules and regulations that effect a significant restriction on the discretion of administrative officers to grant or withhold such credits, then before credits may be rescinded a prisoner has a due process right to have the rules and regulations followed and applied in a non-arbitrary fashion. This is true even though the Constitution did not compel the state to create the system in the first place. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 563–72, 94 S.Ct. 2963, 2978–82, 41 L.Ed.2d 935 (1974); *Parker v. Cook,* 642 F.2d 865, 867–68 (5th Cir. Unit B 1981).

The usual device signaling the existence of a nonconstitutionally-based liberty interest is a rule or regulation "defining the obligations of the authority charged with exercising" discretionary power, *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981), that places "substantive limitations on official discretion" such as " 'particularized standards or criteria [to guide] ... decisionmakers.' " *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (quoting *Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, J., concurring)).

Were this the usual case involving domestic parties our analysis would begin here; we would review the relevant agency decision-making process to determine if sufficiently particularized standards exist to implicate due process values. But this case is fundamentally distinct from the norm in that the appellees are unadmitted aliens, members of a legal classification with a long and lamentable history. While aliens once in the United States have been extended a plethora of important rights under the Equal Protection Clause of the Fourteenth Amendment, *see e.g., Plyler v. Doe,* 457 U.S. 202, 223, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982) (free public education to children of undocumented aliens); *Graham v. Richardson,* 403 U.S.

365, 371, 91 S.Ct. 1848, 1851, 29 L.Ed.2d 534 (1971) (welfare benefits); *Truax v. Raich,* 239 U.S. 33, 42–43, 36 S.Ct. 7, 11, 60 L.Ed. 131 (1915) (right to earn living in common callings), the Supreme Court has held that excludable aliens are largely outside the mantle of the Due Process Clause of the Fifth Amendment, *see Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953) (unadmitted aliens have only such due process rights as provided by law); *Fernandez II,* 734 F.2d at 581–82 & n. 8 (same). "As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu v. United States,* 142 U.S. 651, 660, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892); *see generally* A. Bickel, *The Morality of Consent* ch. 2 (1975) (explaining jurisprudential problems attendant upon keying constitutional rights to distinction between citizen and person).

We could undertake the arduous task of searching the penumbras and interstices of the various immigration law cases to determine if some nonconstitutionally-based right viable for aliens is implicated here. Completely unraveling and then considering all of the permutations of this question would not be easy; nor would it be necessary. It is always prudent for a court to avoid decision on a constitutional question when alternate grounds exist for resolving the case. *See Spector Motor Co. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Even if we assume, *arguendo,* that the rules applicable in the domestic context also apply to aliens, the appellees here are not entitled to relief because they fail to demonstrate the existence of the particularized standards of review that yield a protected liberty interest, as will be explained *infra.* Thus, we can and do decide this case on more narrow grounds and avoid the constitutional question whether unadmitted aliens have action-

able nonconstitutionally-based due process rights.

### 2. Substantive Limitations on Discretion:

■ The trial court determined that, standing alone, the general Immigration and Naturalization Service regulations regarding parole, 8 C.F.R. § 212.5(d) (1985), created no liberty interest because these regulations presented fewer discretionary limitations than did the since-repealed Attorney General's Status Review Plan. That determination was not in error. But the court further determined that the President's "open arms" invitation, coupled with the creation of the special "Cuban/Haitian Entrant (Status Pending)" parole category, evidenced the existence of restrictions on the discretion of executive actors sufficient to constitute an actionable liberty interest in continued parole. This was error.

Appellees provide us with no precedent[5] or logical basis for the proposition that the President or one of his subordinates can, through written or oral public statements alone, create actionable liberty interests.[6] The long-range implications of such a holding would be both profound and dangerous. It is a hallmark of our system of government that certain rights and liberties are enshrined in the social compact. These guarantees may be expanded or contracted through any of several constitutionally provided-for processes. But to give countenance to the notion that one of the political branches can simply wave a magic wand and "create" (and by implication extinguish) constitutional rights would be to undo completely the notion of limited government through separated, checked and balanced powers. This is a step we decline to take.

Appellees also note the creation of a special parole category by the Refugee Education Assistance Act of 1980: Cuban/Haitian Entrant (Status Pending). It is true that in a number of respects appellees were treated more generously than is normally the case with excludable aliens. But as the Supreme Court held in *Dumschat*, the mere fact that "a wholly and expressly discretionary state privilege has been granted generously in the past" does not prove the existence of a constitutional entitlement. Rather, the basis for such claim "must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency." 452 U.S. at 465, 101 S.Ct. at 2464. Justice Brennan has suggested that a party must show "by reference to statute, regulation, administrative practice, contractual arrangement or other mutual understanding—that particularized standards or criteria guide the State's decisionmakers. The *structure* of the State's decisionmaking process is thus as significant as the likely *result* of that process. [Parties must show] that the [agency] is required to base its decisions on objective and defined criteria." *Id.* at 467, 101 S.Ct. at 2465 (Bren-

---

**5.** The appellees refer us to *United States ex rel. Paktorovics v. Murff*, 260 F.2d 610 (2d Cir.1958), where the Second Circuit found that a pre-screened Hungarian refugee who came to America "pursuant to the announced foreign policy of the United States as formulated by the President" was entitled to a parole revocation hearing. *Id.* at 614. While in any event we decline to be bound by that holding, that case is inapposite because there is a critical distinction between the situation in *Paktorovics* and the instant case. While in both cases the President made public pronouncements to the effect that a certain ethnic group was welcome to come to America, in *Paktorovics* "the Congress [thereafter] enacted legislation endorsing the extraordinary action of the President with respect to these Hungarian refugees." *Id.* In the case of

the Mariels, Congress has not seen fit to adopt legislation regularizing their status. *See, e.g.,* S. 3013, 96th Cong., 2d Sess. (1980). Even *Paktorovics* concedes that the President alone lacks the authority to create such a liberty interest *sua sponte.* 260 F.2d at 614.

**6.** Upon direct query from this Court, the attorney for the United States Justice Department likewise admitted that the President of the United States does not have "the power, except as conferred by Congress, to ignore [the immigration] laws." Thus the government too concedes that the President lacks the power, acting on his own, to create or extinguish actionable liberty interests.

nan, J., concurring) (citations omitted; emphasis in original).

The special treatment that the appellees received will not support a due process claim unless they can point to "substantive limitations on official discretion" or "particularized standards or criteria [to] guide the State's decisionmakers," *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747, in making parole decisions. The record here is simply barren of such evidence. Congress declined to adopt any special legislation of the sort *Olim* contemplates, and the language of the 1980 Act can in no way be read to set in place the fetters on discretion that must be evident. The 1980 Act did create a special status for appellees, but only for the purpose of providing social welfare benefits. The Act clearly states that the "President shall exercise authorities with respect to Cuban and Haitian entrants which are identical to the authorities which are exercised under chapter 2 of title IV of the Immigration and Nationality Act [section 1521 et seq. of this title]." 1980 Act, Title V § 501(a)(1) (brackets in original). The purpose of chapter 2 is to provide welfare, medical, educational, and other benefits designed to aid in resettlement, *not* to effect parole. *See also* 1980 Act, Title V § 501(b), (c)(1)(A).

The 1980 Act is devoid of language that in any way modifies the usual rules regarding parole determinations set forth at 8 U.S.C.A. § 1182 (1985). There is no question but that the Mariels were paroled under the general alien parole statute, 8 U.S.C.A. § 1182(d)(5), and were thus treated no differently than any other aliens. Nor has the Justice Department or the Immigration and Naturalization Service promulgated any special rules or regulations. This case is simply not distinguishable from the holding of *Dumschat.* There is no nonconstitutionally-based liberty interest of the sort described in *Olim* at stake here that obtains for either the First or Second Group.

3. The Implications of *Morrissey:*

The appellees argue that as to the members of the Second Group, who were paroled and whose parole was subsequently revoked, nonconstitutionally derived liberty interests can also arise independent of the language in *Olim.* Such interests can also have their source in "a presumption of releasability created by the state when the underlying issue is freedom or incarceration." Appellees' Brief at 12 (emphasis omitted). In short, once a state grants a prisoner his freedom in the form of parole it has created a nonconstitutional liberty interest, whether or not it also provides particularized standards of review. Appellees rely for this proposition on *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), where the Supreme Court held that parole revocation may be effected only if consistent with due process because "[b]y whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment." *Id.* at 482, 92 S.Ct. at 2600.

At first blush this is a strong argument, since the factual parallels between this case and *Morrissey* are strong. But in reality this argument does not get us very far. Careful review of *Morrissey* and *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the case that limited *Morrissey's* reach, makes clear that the liberty interest extant in the parole revocation context is derived *directly* from the Due Process Clause itself. *Morrissey* notes that the state, in granting parole, has given the prisoner a concrete liberty interest by releasing him. That interest implicates "the core values of unqualified liberty...." 408 U.S. at 482, 92 S.Ct. at 2600.[7] It is simply not a nonconstitutional interest. Thus the appellees focus on the wrong factor.

In the case of a nonconstitutional liberty interest the due process claim arises from the creation of rules and machinery. One does not have one's liberty yet, one merely

---

7. Likewise, Justice Powell has characterized the liberty interest here as "fundamental." *Green-*

*holtz,* 442 U.S. at 19, 99 S.Ct. at 2109 (Powell, J., concurring and dissenting).

has an expectancy reinforced by a system capable of granting or withholding that liberty. It is the creation of the *system itself* that yields the due process claim. *See generally Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, J., concurring). On the other hand, a constitutionally-based liberty interest arises only when one actually had one's liberty and has that liberty taken away. Its existence is independent of the presence or absence of a hearing mechanism or promulgated rules. The protected interest is not in the system of parole revocation or in particularized standards *per se,* it is in the fact that the prisoner is actually out and enjoying his liberty, as was the case with the Second Group. We perceive no other way to construe the subsequent holding in *Greenholtz,* where the Supreme Court distinguished between the actionable liberty interest in a hearing upon parole revocation and the non-actionable interest in a hearing on the grant or denial of parole. The latter does not implicate the core values because there is "a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." 442 U.S. at 9, 99 S.Ct. at 2104.

Thus, the appellees have misapprehended the holding in *Morrissey,* and the failure of understanding is crucial. The rights created in *Morrissey* are directly derived from the Due Process Clause. We have held the Due Process Clause yields these aliens no liberty interest in a parole revocation hearing. *Fernandez II,* 734 F.2d at 581–82 & n. 8. Consequently the rights enunciated in *Morrissey* cannot obtain for these respondents, although those rights might have been viable had *Morrissey* been based on a more attenuated nonconstitutional interest.

**4. Conclusion:**

The district court was in error in its finding that appellees demonstrated a non-

constitutionally-based liberty interest subject to due process protections. Their claim under *Olim* fails because, assuming *arguendo* that aliens are governed by the same legal standards applicable to American citizens, the Mariels have failed to demonstrate the existence of any significant restrictions on the discretion of Executive actors. Their claim under *Morrissey* does not obtain because the holding in that case creates constitutionally-based interests that we earlier determined are inapplicable to aliens. Accordingly, that portion of the trial court's judgment is reversed.

**B. *International Law:***

■ The public law of nations was long ago incorporated into the common law of the United States. *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); *The Nereide,* 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769 (1815); *Restatement of the Law of Foreign Relations Law of the United States (Revised)* § 131 comment d (Tent. Draft No. 6, 1985) [hereinafter cited as "*Restatement* 6"]. To the extent possible, courts must construe American law so as to avoid violating principles of public international law. *Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch), 64, 102, 118, 2 L.Ed. 208 (1804); *Lauritzen v. Larsen,* 345 U.S. 571, 578, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1958). But public international law is controlling only "where there is no treaty and no controlling executive or legislative act or judicial decision...." 175 U.S. at 700, 20 S.Ct. at 299. Appellees argue that, because general principles of international law forbid prolonged arbitrary detention,[8] we should hold that their current detention is unlawful.

We have previously determined that the general deportation statute, 8 U.S.C.A. § 1227(a) (1985), does not *restrict* the power of the Attorney General to detain aliens indefinitely. *Fernandez-Roque II,* 734 F.2d at 580 n. 6. But this does not resolve the question whether there has been an

---

**8.** *See, e.g., Restatement* 6 § 702(e), comment h; *Rodriguez-Fernandez v. Wilkinson,* 654 F.2d

1382, 1388 (10th Cir.1981).

*affirmative legislative grant* of authority to detain. As to the First Group there is sufficiently express evidence of congressional intent as to interdict the application of international law: Pub.L. No. 96–533, Title VII, § 716, 94 Stat. 3162 (1980), *reprinted at* 8 U.S.C.A. § 1522 note.[9]

■ The trial court found, correctly, that there has been no affirmative legislative grant to the Justice Department to detain the Second Group without hearings because 8 U.S.C.A. § 1227(c) does not expressly authorize indefinite detention. *Fernandez-Roque v. Smith,* 622 F.Supp. 887, 902 (N.D.Ga.1985). Thus we must look for a controlling executive act. The trial court found that there was such a controlling act in the Attorney General's termination of the status review plan and in his decision to incarcerate indefinitely pending efforts to deport. *Id.* at 903. The appellees and the *amicus*[10] challenge this by arguing that a controlling executive act can only come from an act by or expressly sanctioned by the President himself, not one of his subordinates. *Amicus* Brief at 12. They rely for that proposition upon *The Paquete Habana* and upon the *Restatement of the Law of Foreign Relations Law of the United States (Revised)* § 131 comment c (Tent. Draft No. 1, 1980) [hereinafter cited as *"Restatement 1"*].

As to *The Paquete Habana,* that case involved the capture and sale as war prize of several fishing boats during the Spanish-American War. The Supreme Court found this contrary to the dictates of international law. The *amicus* characterizes the facts of the case such that the Secretary of the Navy authorized the capture and that the Supreme Court held that this did not constitute a controlling executive act because it was not ordered by the President himself. This is a mischaracterization. After the capture of the two vessels at issue, an admiral telegraphed the Secretary for permission to seize fishing ships, to which the Secretary responded that only those vessels " 'likely to aid enemy may be detained.' " 175 U.S. at 713, 20 S.Ct. at 304. Seizing fishing boats aiding the enemy would be in obvious accord with international law. But the facts of *The Paquete Habana* showed the boats in question to be innocent of aiding the Spanish. The Court held that the ships were seized in violation of international law because they were used solely for fishing. It was the *admiral* who acted in excess of the clearly delimited authority granted by the Secretary, who instructed him to act only consistent with international law. Thus *The Paquete Habana* does not support the proposition that the acts of cabinet officers cannot constitute controlling executive acts. At best it suggests that lower level officials cannot by their acts render international law inapplicable. That is not an issue in this case, where the challenge is to the acts of the Attorney General.

As to the *Restatement* 1, the provision upon which *amicus* relies[11] has been removed in subsequent drafts. The most recent version of that provision notes that the President, "acting within his constitu-

---

**9.** That enactment provides:

The Congress finds that the United States Government has already incarcerated recently arrived Cubans who are admitted criminals, are security threats, or have incited civil disturbances in Federal processing facilities. The Congress urges the Executive branch, consistent with United States law, to seek the deportation of such individuals.

Admittedly, the legislation encourages the Executive Branch to act in accordance with United States law. That would implicitly incorporate international law prohibiting detention without a hearing, assuming for argument's sake that the international norm appellees invoke actually applies to circumstances of this sort. But the language suggests that Congress clearly anticipated that the First Group was being and would continue to be held until they could be deported. Congress made no attempt to undo what the Justice Department has already done. In fact they encouraged it to deport these persons. We hold that the First Group is subject to a controlling legislative enactment and hence unprotected by international law.

**10.** The Lawyers Committee for Human Rights filed a brief as *amicus curiae* in support of the appellees.

**11.** *Amicus* cites to *Restatement* 1, § 131, Comment C to the effect that a controlling executive act within the meaning of *The Paquete Habana* can come only from the President himself.

tional authority, may have the power under the Constitution to act in ways that constitute violations of international law by the United States." The Constitution provides for the creation of executive departments, *U.S. Const.* art. 2, § 2, and the power of the President to delegate his authority to those departments to act on his behalf is unquestioned. *See, e.g., Jean v. Nelson,* —— U.S. ——, ——, 105 S.Ct. 2992, 2998, 86 L.Ed.2d 664 (1985). Likewise, in *Restatement* 6, § 135 Reporter's Note 3, the power of the President to disregard international law in service of domestic needs is reaffirmed. Thus we hold that the executive acts here evident constitute a sufficient basis for affirming the trial court's finding that international law does not control.

Even if we were to accept, *arguendo,* the appellees' interpretation of "controlling executive act," *The Paquete Habana* also provides that the reach of international law will be interdicted by a controlling judicial decision. In *Jean v. Nelson,* we interpreted the Supreme Court's decision in *Mezei* to hold that even an indefinitely incarcerated alien "could not challenge his continued detention without a hearing." 727 F.2d at 974–75. This reflects the obligation of the courts to avoid any ruling that would "inhibit the flexibility of the political branches of government to respond to changing world conditions...." *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). We find this decision sufficient to meet the test of *The Paquete Habana.*

### C. *Class Certification:*

Finally, the government contends that the trial court erred in continuing to maintain this case as a class action in light of our opinion in *Garcia-Mir I,* 766 F.2d at 1487–88 n. 11.

We need not pass on this question given our determination, *supra,* that appellees have no actionable liberty interest or international law claim. Appellees have exhausted all avenues of relief available under American law and hence the question whether the case may continue to be maintained as a class-action is moot.

### III.

For the reasons we have explained, we hold that the appellees are entitled to no relief on their claim of a nonconstitutionally-based liberty interest. To that extent, the judgment of the trial court is REVERSED. We also hold that the appellees have stated no basis for relief under international law because any rights there extant have been extinguished by controlling acts of the executive and judicial branches. To that extent the judgment of the trial court is AFFIRMED. The third claim, regarding the continued maintenance of this action in a class form, is DISMISSED AS MOOT.

As both the government and the appellees concede, with today's decision we have reached the point in this longstanding controversy where we have rejected all legal theories, constitutional and otherwise, advanced by the appellees. They have exhausted all claims for relief available in the federal court system at all levels save that of the Supreme Court. Accordingly, it is our judgment that, unless the appellees elect to seek, and the United States Supreme Court elects to grant, a petition for writ of *certiorari,* these cases have reached the terminal point and shall be DISMISSED. *Interest reipublicae ut sit finis litium.*