Rafael FERNANDEZ–ROQUE, et al., Petitioners,

v.

William French SMITH, et al., Respondents.

Moises GARCIA–MIR, et al., Plaintiffs,

v.

William French SMITH, et al., Defendants.

Civ. A. Nos. C81–1084A, C81–938A.

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 25, 1985.

William C. Thompson, David Webster, Dale Schwartz, Myron Kramer, Deborah Ebel, and Kenneth Hindman, Atlanta, Ga., for plaintiffs.

Jack D. Novik and Burt Neuborne, New York City, for amicus American Civil Liberties Union.

Arthur C. Helton, New York City, for amicus Lawyers Committee for Intern. Human Rights.

Richard K. Willard, Acting Asst. Atty. Gen., Civ. Div., Washington, D.C., Larry D. Thompson, U.S. Atty., Atlanta, Ga., Lauri Steven Filppu, Washington, D.C., Barbara Tinsley, Sharon Douglas Stokes, Nina R. Hickson, Atlanta, Ga., David J. Kline, Washington, D.C., Madelyn E. Johnson, Washington, D.C., for defendants.

## ORDER

SHOOB, District Judge.

In *Fernandez-Roque v. Smith,* 734 F.2d 576, 582 (11th Cir.1984), the Eleventh Circuit Court of Appeals rejected plaintiffs' claim to a constitutionally-protected liberty interest in parole arising from the due process clause of the United States Constitution (i.e., a "core" liberty interest). In that case, however, the court expressly reserved decision on two other issues raised by plaintiffs in challenging their detention: (1) whether the class members have a federally-created liberty interest in parole, not arising directly from the Constitution itself; and (2) whether their continued detention under the standards and procedures applied to them violates international law. *Id.* at 582 n. 10.[1]

---

1. This Court did not reach these issues in its 1983 order addressing plaintiffs' claim to a "core" liberty interest. *See Fernandez-Roque v.* *Smith,* 567 F.Supp. 1115, 1128–29 n. 5 (N.D.Ga. 1983), *rev'd,* 734 F.2d 576 (11th Cir.1984). Nor were these issues presented to or addressed by

## BACKGROUND

A brief background of this lengthy, disturbing, and complex litigation will facilitate an understanding of the issues now presented. These consolidated cases are class actions brought on behalf of those Cubans who arrived in the United States in 1980 as part of the "Freedom Flotilla" from Mariel Harbor and who were, are, or will be incarcerated at the Atlanta Federal Penitentiary. Most of the approximately 125,000 to 130,000 "Marielitos" arrived without the proper documents to enter this country legally. Nonetheless, after being screened by U.S. government officials, most of them were immediately paroled into the United States by the Attorney General pursuant to 8 U.S.C. § 1182(d)(5). Approximately 1800 of those not paroled were incarcerated and in 1981 were transferred to the Atlanta Federal Penitentiary.

In 1981, after the Court began to review the legality of plaintiffs' confinement and ordered the release of certain groups of the detainees, the Attorney General initiated his "Status Review Plan and Procedures" to evaluate the necessity of each class member's continued detention. Under the Plan,[2] two Department of Justice officials would review each case and declare a detainee "releasable" if they found that he satisfied the Plan's criteria for release by being nonviolent, likely to remain nonviolent, and unlikely to commit any criminal offenses after his release. If the panel recommended release and a designated representative of the Commissioner of the Immigration and Naturalization Service ("INS") approved, the detainee was paroled as soon as a suitable sponsor was found. *Fernandez-Roque v. Smith*, 567 F.Supp. at 1130–31.

Releases under the Status Review Plan ended with the December 14, 1984 announcement that Cuba had agreed to accept the return of a group of 2746 Marielitos, an agreement that was later suspended. Because the Plan has been retired, the only formal guidelines for parole decisions are the general parole regulations at 8 C.F.R. § 212.5; these regulations, however, specify no procedures to be followed in parole determinations. Since this litigation began, all but three to four hundred of the approximately 1800 Mariel Cubans originally incarcerated in the Atlanta Penitentiary have been paroled. The Cuban population at the penitentiary currently exceeds 1800, however, because many class members who were initially paroled into the United States have had their paroles revoked for varying offenses ranging from relatively minor infractions to serious crimes.

Over the course of this litigation, plaintiffs have challenged their continued indefinite detention on several grounds. Plaintiffs as a class have argued unsuccessfully that their detention violates statutory[3] and constitutional[4] restrictions on the Attorney General's power to detain excludable aliens. Plaintiffs as a class also have attempted to establish that the Attorney General has abused his discretion by failing to follow his own criteria in making parole decisions, but this Court has declared that issue inappropriate for class action treatment.[5] Until now, however, no court has reached the merits of plaintiffs' arguments that their continued indefinite detention violates (1) a federally-created liberty interest and (2) international law. Those issues are ripe for decision and are addressed below.

---

the Court of Appeals in a later appeal in the same consolidated cases. *See Garcia-Mir v. Smith,* 766 F.2d 1478 (11th Cir.1985).

**2.** For an extensive description of the Status Review Plan, *see Fernandez-Roque,* 567 F.Supp. at 1130–31.

**3.** This Court rejected this argument, finding that the relevant statute, 8 U.S.C. § 1227(a), imposed no limitations on the Attorney General's author-

ity to detain excludable aliens. The Eleventh Circuit Court of Appeals agreed. *Fernandez-Roque v. Smith,* 567 F.Supp. at 1124–25, *rev'd on other grounds,* 734 F.2d at 580 n. 6.

**4.** Relying on *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984) (en banc), the Eleventh Circuit Court of Appeals rejected this argument in *Fernandez-Roque,* 734 F.2d at 582.

**5.** *Fernandez-Roque,* 567 F.Supp. at 1143–44.

## I. *Federally-Created Liberty Interest*

 Before considering the merits of plaintiffs' claim to a federally-created liberty interest, the Court addresses the government's threshold arguments that habeas corpus is inappropriate for declaratory or injunctive relief and that plaintiffs have made no factual showing of prejudice resulting from the alleged inadequacy of the procedures governing their detention. The first argument fails because these consolidated cases do not seek only habeas corpus relief; the complaint filed by Garcia-Mir also requests declaratory and injunctive relief. The second argument, which focuses on certain *procedural* flaws as being "harmless error," fails to address the *substantive* aspects of any liberty interest that may have been created. Further, this second argument ignores the United States Supreme Court's recognition that certain procedural errors may affect rights so basic that they can never be considered "harmless error." *United States v. Hastings*, 461 U.S. 499, 103 S.Ct. 1974, 1980 n. 6, 76 L.Ed.2d 96 (1983). Plaintiffs have alleged procedural errors—including lack of adequate notice of charges and denial of an opportunity to present and cross-examine witnesses—that fall within the category that can never be deemed harmless error. Accordingly, plaintiffs are entitled to have their claim decided on the merits.

The notion of a federally-created liberty interest is not a novel one. On numerous occasions the United States Supreme Court has held that even when a liberty interest does not arise from the independent operation of the due process clause itself, the government may create such an interest by governmental action, such as a statute, regulation, rule, practice, or policy. Before examining the potential sources of the federally-created liberty interests claimed by plaintiffs, the Court will review the standards for determining whether such an interest exists.

 It is well-settled that a protected interest does not arise simply because governmental action subjects an individual to a "grievous loss." *Meacham v. Fano*, 427

U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). Instead, the relevant inquiry concerns the nature, rather than the weight, of the interest that has been impaired. *Id.; see also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979); *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

 Thus, to establish that a protected interest exists, it is necessary to demonstrate a legitimate claim of entitlement; it is not enough that a person has "an abstract need or desire" for the benefit at issue. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Moreover, as long as the official decisionmaker has unfettered discretion to accord or deny a benefit, no protected interest exists. *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Meacham*, 427 U.S. at 228, 96 S.Ct. at 2540; *Montanye v. Haymes*, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); cf. *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). Therefore, governmental action setting forth guidelines that are merely procedural will not suffice to create a protected liberty interest if, in the final analysis, the relevant decision is purely discretionary. *Wakinekona*, 103 S.Ct. at 1748. On the other hand, that a statute or policy allows for the exercise of discretion does not mean that the statute or policy cannot create a protected interest. *See Greenholtz*, 442 U.S. at 12–13, 99 S.Ct. at 2106. Summarizing prior case law, the Supreme Court in *Wakinekona* stated that the government creates a protected liberty interest "by placing substantive limitations on official discretion." 103 S.Ct. at 1747.

Even in the immigration context, courts have indicated that the government may create liberty interests. *See, e.g., Jean v. Nelson*, 727 F.2d at 981; *Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir.1984). In *Jean*, after the court rejected plaintiffs' claim to a "core" constitutional right to

equal protection in parole decisions, the Court went on to apply the doctrine of federally-created liberty interests in considering whether the Refugee Act of 1980 created a liberty interest in asylum for excludable Haitians. The court in *Jean* articulated the following standard before finding that no such liberty interest existed:

> [W]hen dispensation of a statutory benefit is clearly at the discretion of an agency, or when a statute only provides that certain procedural guidelines be followed in arriving at a decision, then there is no creation of a substantive interest protected by the Constitution. *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Bishop v. Wood*, 426 U.S. 341, 345–47, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976); *Olegario v. United States,* 629 F.2d 204, 223–224 (2d Cir.1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

727 F.2d at 981.

Although most of the cases cited above concerned statutes or regulations as sources of liberty interests, a broad variety of governmental actions may give rise to a liberty interest. *Dudley v. Stewart*, 724 F.2d 1493, 1497–98 (11th Cir.1984) (quoting *Parker v. Cook*, 642 F.2d 865, 867 (5th Cir. Unit B 1981)). In *Parker* the court explained that the "substance" of the governmental action controls:

> Since states rarely if ever explicitly label their creations as "liberty interests," we must look to the substance of the state action to determine whether a liberty interest has been created. And whether this substance is embodied in a constitution, statute, regulation, rule, or practice is of no significance....

642 F.2d at 867.

In presenting their liberty interest arguments, plaintiffs suggest that their class members be considered as falling within two analytically distinct groups. One group consists of plaintiffs who, upon their arrival in the United States in 1980, were identified as being mental incompetents or as having committed serious crimes in Cuba and who, consequently, have been in detention ever since (the "First Group"). The other, larger group is composed of those class members who, after being screened by U.S. government officials and determined not to have been mentally incompetent or to have committed serious crimes in Cuba, were paroled into the United States as "Cuban/Haitian entrants" and whose paroles have been or will be revoked (the "Second Group").[6] According to plaintiffs, distinguishing between these two groups is important because plaintiffs advance different arguments in support of each group's claim to a federally-created liberty interest.

### A. The "First Group"

With respect to the "First Group"—those class members continuously detained as incompetents or serious criminals since their arrival—plaintiffs maintain that the federal government has created a liberty interest in parole by virtue of (1) the Attorney General's Status Review Plan and Procedures (the "Plan"); (2) executive policies for detained Mariel Cubans; and (3) the 1967 Protocol Relating to the Status of Refugees[7] (the "Protocol"). For the reasons set forth below, the Court finds that no liberty interest has been created for members of the First Group.

■ First, the Court addresses the Status Review Plan as a possible source of a liberty interest. 8 U.S.C. § 1182(d)(5) authorizes the Attorney General, "in his discretion," to parole unadmitted aliens into the United States. Plaintiffs argue that the Attorney General "determined not to use the broad parole standards in [that subsection], but considerably constricted his substantive discretion" by issuing the

---

**6.** As will be evident below, recognizing that the government's initial screening of some of the class members may have been inaccurate, the Court has focused on those plaintiffs who *in fact* were not mental incompetents and who *in fact* had not committed serious crimes in Cuba.

**7.** 19 U.S.T 6223, T.I.A.S. No. 6557.

Status Review Plan.[8] Plaintiffs' November 30, 1984 Brief at 8. According to plaintiffs, the Plan created a protected liberty interest because it contained mandatory procedural requirements and placed substantive limitations on the discretion of the decisionmaker. *Id.* at 12.

The Plan appears to place at least some "substantive limitations on official discretion," limitations that arguably might give rise to a liberty interest. *See Olim v. Wakinekona,* 103 S.Ct. at 1747. On the other hand, the Eleventh Circuit Court of Appeals has described the Attorney General's discretion over parole as "remarkably broad," *Garcia-Mir v. Smith,* 766 F.2d at 1484 (citing *Jean,* 727 F.2d at 977), and has rejected the argument that the Plan limits the broad discretion delegated to the Attorney General under 8 U.S.C. § 1182(d)(5). 766 F.2d at 1485. As in *Jean,* because "dispensation of a statutory benefit is clearly at the discretion of an agency,"[9] the Court must conclude the Plan cannot be a source of a liberty interest.

■ As another ground for establishing a liberty interest for members of the "First Group," plaintiffs rely on an "executive pronouncement" issued by the White House on June 7, 1980:

The President has directed the Attorney General to take the following actions:

First, Cubans identified as having committed serious crimes in Cuba are to be securely confined. Exclusion proceedings will be expedited to the maximum extent consistent with constitutional requirements for due process of law.

Second, exclusion proceedings will also be started against those who have violated American law while waiting to be reprocessed or relocated. The Justice Department will investigate all serious violations of the law, and the Justice Department will bring prosecutions where justified. Those responsible for the disturbances at Fort Chaffee are confined and *will be confined until fair decisions can be made on criminal prosecution or exclusion from this country or both.* Similar measures will be taken in the event of any future disturbances.

(Emphasis supplied by plaintiffs.)

An initial problem with plaintiffs' argument is that the language emphasized concerns only those plaintiffs who committed crimes after their arrival in the United States. It is not clear that this language applies to any or all members of the First Group—those plaintiffs detained as being mental incompetents or as having committed serious crimes in Cuba. Even if the language were applicable, however, the policies expressed do not place the "substantive limitations on official discretion" necessary to give rise to a liberty interest. Accordingly, this argument fails.

■ Plaintiffs also rely on Article 31 of the 1967 Protocol Relating to the Status of Refugees as a source of a liberty interest for members of the First Group. Plaintiffs maintain that the Protocol applies to them as applicants for political asylum. The Eleventh Circuit Court of Appeals, however, rejected plaintiffs' class-wide asy-

---

8. On February 12, 1985, the Attorney General purported to terminate the Status Review Plan. Although the government no longer follows the procedures set forth in the Plan, plaintiffs argue that the Plan remains in effect because it was not effectively repealed pursuant to the Administrative Procedure Act (APA). Although this issue was briefed for the the Court of Appeals in *Garcia-Mir,* the issue was not addressed in the resulting opinion. *See* 766 F.2d 1478. Consequently, the parties have raised the same arguments before this Court.

Plaintiffs concede that if the Plan need not have been repealed pursuant to the APA, the issue whether the Plan creates a liberty interest is moot. Plaintiffs' March 27, 1985 Brief at 6. The Court need not decide this issue because it finds that even if the Plan remains in effect, it does not create a liberty interest. The Court expresses no opinion concerning the APA issue.

9. 727 F.2d at 981. In *Jean* the Court of Appeals found that because the relevant statute, 8 U.S.C. § 1158(a), authorized the Attorney General to grant asylum to refugees *"in his discretion,"* that statute created no liberty interest in asylum. *Id.* at 981–82; *see also* Note, *The Right to Appointed Counsel in Asylum Proceedings,* 85 Colum.L.Rev. 1157, 1173–76 (1985).

lum claim in *Garcia-Mir v. Smith,* 766 F.2d at 1492–93. Because the Court cannot determine which class members can still be considered applicants for asylum, the Court finds that class-wide treatment of this issue is not appropriate. *See id.* at 1487 n. 11.[10] Thus, the Court will not address the merits of this argument. In sum, the Court finds no federally-created liberty interest in parole for those plaintiffs who have been in continuous detention since 1980 for being mental incompetents or for having committed serious crimes in Cuba.

### B. The "Second Group"

After their arrival in the United States, the members of the Second Group, along with the vast majority of Mariel Cubans,[11] were screened by the Immigration and Naturalization Service and were released on parole. Since November 1980, when INS developed certain parole revocation policies applicable only to Mariel Cubans, the criteria for revocation of parole have changed from time to time. *See* Declaration of John A. Simon, Exhibit 15 to Plaintiff's November 30, 1984 Brief. Until May 1982, the general policy was to revoke a Mariel Cuban's parole if he or she had no means of support, no fixed address, and no sponsor, or if he or she had been convicted of a felony or a serious misdemeanor. *Id.* Beginning in May 1982, the general policy provided for revocation of the parole of any Mariel Cuban "(1) who has been convicted in the United States of a felony or a serious misdemeanor and who has completed the imprisonment portion of the sentence; or

(2) who presents a clear and imminent danger to the community or himself." *Id.*

In March 1983, a supplemental parole revocation policy was established only for those Mariel Cubans who had been released from the Atlanta Penitentiary to the custody of the Public Health Service or to "special placement" half-way houses. *Id.* This supplemental policy placed other conditions—such as curfews, travel restrictions, and mandatory participation in certain programs—on the parole of these Cubans; violations of these conditions were additional grounds for revocation of parole. *Id.*

Over the past five years, parole revocations have sent a continuous stream of Mariel Cubans into the Atlanta Penitentiary, presumably in accordance with the guidelines described above.[12] Plaintiffs maintain that under these parole revocation guidelines, "there is no provision whatsoever for prior notice, hearing, interview or even input from the parolee" before parole is revoked. Plaintiffs' November 30, 1984 Brief at 22. Plaintiffs challenge the government's parole policies and procedures by contending that the members of the Second Group have a federally-created liberty interest in their continued parole by virtue of (1) the Attorney General's Status Review Plan; (2) the general parole regulations at 8 C.F.R. § 212.5(d)(2); (3) the creation of a special "Cuban/Haitian entrant" status for Mariel Cubans; and (4) the Presidential invitation to Mariel Cubans to come to this country.

The Court concludes that neither the Status Review Plan nor the general

---

**10.** The Court does not address the merits of this argument and, therefore, expresses no opinion on whether an individual plaintiff raising this argument in an individual habeas corpus action might be successful.

**11.** As noted above, of the estimated 125,000 to 130,000 Mariel Cubans who arrived in the 1980 "Freedom Flotilla," only approximately 1,800 were detained on their arrival because of alleged serious criminal conduct in Cuba or because of mental problems.

**12.** While the paroles of some class members have been revoked for convictions of crimes

such as murder, armed robbery, and aggravated assault, other class members have been sent to the Atlanta Penitentiary for convictions of less serious crimes—such as driving under the influence—even though they had completed serving their sentences for those crimes. Still others have had their paroles revoked for simply being charged with a crime, or for parole violations that are noncriminal. Because these class members had been living freely in American society, often when they entered the penitentiary they left behind wives and children who are American citizens.

parole regulations provides a liberty interest for plaintiffs. The Court does find, however, that those Mariel Cubans who were not mental incompetents and who had not committed serious crimes in Cuba came to the United States because they were invited by the President of this country. This invitation by the President gave rise to a protected liberty interest in continued parole that cannot be impaired without due process of law.[13] The Court's reasoning is set forth below.

■■■■ First, just as the Status Review Plan created no liberty interest for members of the First Group, it cannot be a source of a liberty interest for those plaintiffs in the Second Group. For similar reasons, the Court finds that the parole regulations at 8 C.F.R. § 212.5(d) provide no liberty interest because they appear to place even fewer substantive restrictions on official discretion than did the Status Review Plan. To hold otherwise would be inconsistent with the Eleventh Circuit's decision in *Garcia-Mir v. Smith*, 766 F.2d at 1485.

■■■■ The special "Cuban/Haitian entrant" status presents a closer question. In June 1980, the executive department announced that

the President has decided to seek special legislation regularizing the status of Cuban-Haitian entrants. This legislation will allow them to remain in the United States and will make them eligible for certain benefits, but it will not provide the status or benefits accorded to those admitted as refugees or granted political asylum.

Exhibit 32 to Plaintiffs' November 30, 1984 Brief (Statement of Ambassador Victor Palmieri, U.S. Coordinator for Refugee Affairs, June 20, 1980). On July 3, 1980, it became the government's policy that Cuban/Haitian entrants, who were defined as all Cubans who arrived in the United States from April 21, 1980 to midnight October 10, 1980, and all Haitians who were in INS proceedings as of midnight, October 10, 1980, were to be "paroled or granted extended voluntary departure or stay of deportation, as appropriate," instead of being processed under the ordinary exclusion or deportation procedures. *See* INS Telexes, Exhibits 33–37 to Plaintiffs' November 30, 1984 Brief. Under the proposed legislation, Cuban/Haitian entrants would have been entitled to convert to permanent resident alien status after two years.

The legislation "regularizing" the status of Cuban/Haitian entrants, however, has yet to be enacted by Congress.[14] Thus, any liberty interest created by this special status must arise from the executive branch's policies and practices in implementing the Cuban/Haitian entrant status. In the Court's view, this issue is so intertwined with the invitation issue that the Court will consider them together.

With respect to the invitation issue, plaintiffs have presented documentary evidence of various actions by the executive branch to demonstrate that the President invited to this country "tens of thousands" of Cubans who had not committed serious crimes in Cuba and who were not mentally incompetent. Those executive actions commenced in April 1980, after approximately 10,800 Cubans claiming status as political refugees sought sanctuary in the Peruvian embassy in Havana. *See United States v. Frade*, 709 F.2d 1387, 1389 (11th Cir.1983).

---

**13.** In addressing the "Second Group," the Court makes clear that no class members who were mentally incompetent or who had committed serious crimes in Cuba were invited by the President. Consequently, even if a class member initially was paroled into the United States, he could not claim the liberty interest if it could be determined that he in fact had been a mental incompetent or had committed any serious crimes in Cuba. Conversely, if it came to light that a class member had been inaccurately classified as one who had been a mental incompe- tent or had committed a serious crime in Cuba, that class member could assert this liberty interest.

**14.** Although Congress has not passed this legislation, it appears that the executive branch is allowing the vast majority of Cuban/Haitian entrants to apply for permanent resident status. *See* The Wall Street Journal, November 13, 1985, at 1 col. 1.

President Carter's response is described in *Pollgreen v. Morris,* 496 F.Supp. 1042 (S.D. Fla.1980), as follows:

> Recognizing "that special circumstances exist[ed]," President Jimmy Carter on April 14, 1980, determined that those persons in the Peruvian embassy "who otherwise qualify may be considered *refugees* even though they are within their country of nationality or habitual residence." Further, declaring "that an unforeseen emergency *refugee* situation exists" President Carter concluded that "grave humanitarian needs" and the "national interest" justified the admission of up to 3500 of the refugees to this country and the appropriation of up to $4.25 million to aid in their resettlement pursuant to the Refugee Act of 1980. 45 Fed.Reg. 28079 (April 14, 1980).

*Id.* at 1047 (footnote omitted) (emphasis supplied by the *Pollgreen* court).

Later that month, an airlift of disaffected Cubans to Costa Rica began but was abruptly suspended by Castro, who instead announced that departing Cubans could leave from Mariel Harbor. Consequently, flotillas of small boats began treks from the United States to Mariel to retrieve relatives. Addressing this unprecedented exodus, the President, Vice-President, and State Department issued several official statements over a period of a few weeks. Plaintiffs here have identified various aspects of these statements that signify the executive department's policy and practice of supporting these Cuban emigrants by assisting those at sea and by taking steps to resettle large numbers of them within the United States.[15]

Most strikingly indicative of an "invitation" was a statement by President Carter at a May 5, 1980 press conference, a statement that was publicized in the Cuban press. *See* Exhibit 24 to Plaintiff's November 30, 1984 Brief (articles from *Granma,* the official Cuban newspaper, May 18, 1980). The President announced that the United States would receive "tens of thousands" of Cubans with "an open heart and open arms." [16]

15. These statements are reprinted in 80 Department of State Bulletin, Number 2039 (June 1980) (Exhibit 20 to Plaintiff's November 30, 1984 Brief). Plaintiffs rely on these statements of policy in arguing as follows:

> On April 23, 1980, the Department of State issued a statement indicating our country's deep sympathy for those seeking freedom from Castro's regime, while urging that the boatlift stop but that the airlift be reinstated. *See* Exhibit 20. On April 27, 1980, the President called on Castro to allow evacuation of the growing number of disaffected Cubans in an orderly, safe and humane way, ordered the Coast Guard and Navy to assist those at sea, asked the Cuban-American community not to go to Mariel, and advised Cuba that if it wanted to expel its people the United States would contribute to this effort, but in an orderly, safe and humane evacuation process. Exhibit 20. At the time this statement was made, 6,053 Cubans had already arrived at Key West. Exhibit 21, p. 5.
>
> On May 1, 1980, the Navy was ordered to help move the "Flotilla". Exhibit 21, p. 4, n. 19.
>
> On May 2, 1980, the White House issued a statement concerning its plan to handle the increasing number of Cuban refugees; it stated that it would add processing centers and could handle daily flows of 2,500–3,000 refugees; that the Coast Guard expanded its capability to assist the Flotilla and that resettlement assistance was being developed. Exhibit 20.

Plaintiffs' November 30, 1984 Brief at 26. References to Exhibit 21 to Plaintiff's Brief are to a special report of the Council for Inter-American Security, entitled "The 1980 Mariel Exodus: An Assessment and Reappraisal."

16. The President's statement was in response to the following question from a representative of the League of Women Voters. The full text is as follows:

> Q. In light of thousands of illegal and legal immigrants arriving daily, a problem which is reaching critical proportions, what does your administration intend to do about enforcing current immigration laws and providing funds and programs for dealing with these newcomers, who are presently a great burden on local communities?
>
> THE PRESIDENT. The entire subject or issue or problem of the Cuban refugees has been greatly aggravated by the inhumane approach by Fidel Castro. We, as a nation, have always had our arms open to receiving refugees in accordance with American law. We now have more than 800,000 Cuban refugees in our country, who are making outstanding new American citizens, as you know.
>
> I have a responsibility to administer the law, because I've taken an oath to do so, and to

Plaintiffs support their characterization of these executive actions as an "invitation" with statements from members of the judicial and legislative branches of government. According to this circuit in *United States v. Frade*, 709 F.2d at 1395, this "open heart and open arms" statement "was broadly interpreted as governmental approval of the boatlift." [17] Further, Congressman Gillis Long testified in *Frade* that he "was of the impression from the President's [May 5] statement ... that the United States was encouraging and welcoming" the boatlift. *Id.* at 1394–95.

According to plaintiffs, later actions by the executive branch buttress their argument that an invitation was extended to members of the Second Group. On May 14, 1980, the President issued a policy statement proposing that, as an alternative to the flotilla, Castro permit pre-screening by U.S. officials of all those who wished to leave Cuba and permit an air or sea lift conducted by our government. The court in *Frade* interpreted this announcement as one that the administration

would continue to welcome legitimate Cuban refugees, but would take firm coordinated action to prevent the two dangers which had emerged from the boatlift: death and injury at sea resulting from passage in unsafe vessels, and entry into the United States of Cuban undesirables forced onto the boats by the Castro regime.

709 F.2d at 1396. Thus, plaintiffs maintain, although the government took steps to stop the Flotilla, the government continued to implement the policy articulated by the President in a May 29, 1980 statement: "the [Mariel Cubans] who are already here will be assimilated into the American population. Their legal status has not yet been determined." *See* Exhibit 31 to Plaintiffs' November 30, 1984 Brief.

As additional evidence that the members of the Second Group were invited by the President, plaintiffs point to the executive branch's creation of the special Cuban/Hai-

---

administer it in a fair and equitable way. It's important for me, for instance, to treat the Cuban refugees with the same degree of compassion and understanding and with the same commitment to the law as we do the refugees from Haiti and from other countries. We are the most generous nation on Earth in receiving refugees, and I feel very deeply that this commitment should be maintained.

Ours is a country of refugees. Many of those in this room have either parents or grand-parents who were refugees who came here looking for a new life of freedom, a chance to worship as they pleased, or a chance to combine their own talents to build a growing and dynamic country. Those of us who have been here for a generation or six or eight generations ought to have just as open a heart to receive the new refugees as our ancestors were received in the past.

I have organized within the White House, under a senior assistant, Jack Watson, a combined group of departments who are working on this special inflow of Cuban refugees. In the last few days we have received more than 10,000 from Cuba. We've now opened up a staging area at Eglin Air Force Base in the northwestern part of Florida, and we're receiving these refugees now, primarily into the Key West area.

As you know, there are almost 400 of those who have been issued visas by our country who are hiding from mob violence instigated by Castro himself, and we're trying to get those freed by Castro to come on into our country. These are primarily former political prisoners. So, those 400 plus *literally tens of thousands of others will be received in our country with understanding, as expeditiously as we can, as safely as possible on their journey across the 90 miles of ocean, and processed in accordance with the law.*

So, I don't know how else to answer your question except to say we're doing the best we can. I think the local and State officials in Florida have been extraordinarily forthcoming. We do have a need to go back to the Congress for additional funds to care for this unexpected influx of refugees. You can help here; the League can help. *But we'll continue to provide an open heart and open arms to refugees seeking freedom from Communist domination and from economic deprivation, brought about primarily by Fidel Castro and his government.*

(Emphasis added.)

17. In fact, on the day after the President's May 5, 1980 "open heart and open arms" statement, column 1 of the front page of *The New York Times* contained the following headline:

PRESIDENT SAYS U.S. OFFERS 'OPEN ARMS' TO CUBAN REFUGEES

---

WARM RECEPTION IS PROMISED

tian entrant status. According to plaintiffs, these class members were not merely paroled as ordinary excludable aliens, but instead were accorded this unique status as an interim step toward permanent resident status.

Plaintiffs further argue that the Presidential invitation, coupled with the creation of the Cuban/Haitian entrant status, places this case squarely within the holding of *United States ex rel. Paktorovics v. Murff,* 260 F.2d 610 (2d Cir.1958). The court in *Paktorovics* held that an excludable alien who was one of thousands of Hungarians invited to the United States by the President in 1956 was entitled to a due process hearing before his parole could be revoked. The court found that plaintiff's acceptance of the Presidential invitation to come to this country changed his status "sufficient to entitle him to the protection of our Constitution." *Id.* at 614. According to *Paktorovics,* the invitation made that case *sui generis* and distinguished it from Supreme Court cases such as *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), a case that stands for the proposition that excludable aliens have no constitutional protection against continued detention pending their exclusion. *See Jean v. Nelson,* 727 F.2d at 970.

After considering the various executive actions and policy statements discussed above in context of the events that prompted them, the Court agrees with Congressman Long's assessment [18] and concludes that those Mariel Cubans who were not mental incompetents and who had not committed serious crimes in Cuba came to this country in response to an invitation from the President of the United States.

This invitation, however, was not necessarily unconditional. The government, al-though not conceding that plaintiffs were invited, argues that any invitation extended was qualified by the requirement that the Cubans be "admitted" into this country in accordance with U.S. immigration law.[19] The government maintains that such an invitation would not affect plaintiffs' status as excludable aliens, who are entitled "only to the rights and procedures accorded them by Congress or the Executive." Government's January 23, 1985 Memorandum at 30. The government's position is that this is simply a garden variety exclusion case. Even if the President invited plaintiffs to this country, in the government's eyes they are merely excludable aliens who may be refused parole or have their paroles summarily revoked, and may be detained indefinitely pending exclusion, all in the discretion of government officials and subject to a very narrow standard of judicial review.

The Court notes that the language of the executive policy statements comprising the invitation did not spell out all its parameters and legal ramifications; indeed, the President acknowledged this fact when he announced on May 29, 1980 that "the [Cubans] who are already here will be assimilated into the American population. Their legal status has not yet been determined." The Court, therefore, must inquire what, if any, qualifications or conditions can reasonably be inferred from the invitation.

At the time the President invited "tens of thousands" of Cubans to our country in May 1980, it was obvious that these persons would arrive without proper entry documents and in far greater numbers than allowed by immigration quotas. In light of these facts, it is nonsensical to suggest that the President invited plaintiffs to the United States to be treated no differently than unadmitted aliens who are caught attempting to steal past our borders. Nor

---

**18.** *See Frade,* 709 F.2d at 1394–95.

**19.** The government maintains that the executive statements and policies discussed above cannot "be interpreted to mean that the President or the government ever invited to the United States any Cuban with a criminal background or any Cuban who could not or would not comply with our immigration laws." Government's January 23, 1985 Brief at 30. Plaintiffs do not contend, however, that the President invited anyone who had committed serious nonpolitical crimes in Cuba. Thus, the Court is concerned only with the government's position that no Cuban was invited who could not or would not comply with U.S. immigration law.

can it be argued with any reason or logic that plaintiffs were invited to face indefinite confinement until Castro agreed to their return to Cuba, just as no one would seriously contend that the more than 120,000 other Mariel Cubans who came to this country in response to the invitation would be returned to Cuba if Castro agreed to accept them.

The Court, therefore, finds that a necessary component of the Presidential invitation was that the legal status of those Cubans invited would be greater than the status of ordinary excludable aliens, a result evident from the special Cuban/Haitian entrant status accorded this group. Pursuant to the invitation, the "tens of thousands" of Cubans invited were to have been "assimilated into the American population." *See* President's Statements of May 5 and May 29, 1980. The invitation, then, can only reasonably be interpreted as according an interim status to those invited as a step to permanent residency status.

Next, the Court must determine whether this invitation created a protected liberty interest. According to *Olim v. Wakinekona*, 103 S.Ct. at 1747, the government "creates a protected liberty interest by placing substantive limitations on official discretion." Applying this standard to the invitation, the Court again notes that the only reasonable interpretation of the invitation is that it is the expression of an executive policy and practice to afford plaintiffs some greater status than that afforded ordinary excludable aliens, over whose liberty the Attorney General has "remarkably broad" discretion. *See Jean v. Nelson*, 727 F.2d at 977. By elevating these plaintiffs' legal status over that of ordinary excludable aliens, the invitation limited the Attorney General's discretion over their parole. Further, these limitations are substantive, not merely procedural; the invitation concerned the substantive right to be "assimilated into American society," not merely the right to demand that certain procedures be followed by the Attorney General in determining whether these plaintiffs should be detained. Consequently, the Court finds that the invitation did create a protected liberty interest in continued parole for those plaintiffs who were not mental incompetents and who had not committed serious crimes in Cuba.

This holding presents no conflict with *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), or with the Eleventh Circuit's decisions in *Jean, Fernandez-Roque,* or *Garcia-Mir*, all of which relied on *Mezei*. None of those decisions addressed the legal effect of a Presidential invitation or took into account the possibility of a federally-created liberty interest. In the only other case known to the Court that concerned a Presidential invitation, *United States ex rel. Paktorovics v. Murff,* the court reached a similar conclusion by holding that such an invitation altered an excludable alien's status "sufficient to entitle him to the protection of our Constitution."[20] 260 F.2d at 614. In short, recognition of these plaintiffs' federally-created liberty interest is a narrow holding that does not conflict with *Mezei* and its progeny.

■ Given that a liberty interest has been created, the next issue is what due process requires in its protection. The Court must examine both the substantive and the procedural aspects of the liberty interest in making this determination. The substantive aspect ensures that the government may interfere with plaintiffs' interest in being free on parole only when sufficient justification exists.[21] The procedural as-

---

**20.** The *Paktorovics* decision preceded the development of the doctrine that non-"core" liberty interests can be created by government action. *See* Note, *The Right to Appointed Counsel in Asylum Proceedings,* 85 Colum.L.Rev. 1157, 1171 (1985) (discussing *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) ). If *Paktorovics* were to be decided today, it appears likely that the court would rely on this doctrine in reaching the same conclusion.

**21.** Quoting a Seventh Circuit case, the Supreme Court in *Olim v. Wakinekona* addressed the substantive element of a liberty interest:

"A liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality." Process

pect guarantees that certain procedural protections will accompany this decision.

 This Court previously has identified what substantive and procedural protections must be afforded plaintiffs if they are found to have a "core" liberty interest in parole. *Fernandez-Roque v. Smith,* 567 F.Supp. at 1128–45. Plaintiffs argue that although the Eleventh Circuit Court of Appeals has held that plaintiffs have no "core" liberty interest in parole, *see Fernandez-Roque v. Smith,* 734 F.2d at 582, these same protections should apply to plaintiffs' federally-created liberty interest. This argument is consistent with the Supreme Court's emphatic statements in *Vitek v. Jones* that "the adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms." 445 U.S. 480, 490–91 n. 6, 100 S.Ct. 1254, 1262 n. 6, 63 L.Ed.2d 552 (1980) (quoting *Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (1974)).[22] Thus, even though the source of plaintiffs' liberty interest is not the Constitution itself, the same constitutional standards should govern its protection. The Court agrees that the procedural protections shall be those enunciated at 567 F.Supp. 1129–45.

The substantive standards previously identified by this Court require some modification. When it addressed the substantive aspects of plaintiffs' liberty interest in parole, this Court held that when immedi-ate exclusion is impracticable, plaintiffs may be detained only if found to be "likely to abscond, to pose a risk to the national security, or to pose a serious and significant threat to persons or property within the United States." 567 F.Supp. at 1128 (footnote omitted). Given that plaintiffs' liberty interest is based on an invitation that did not contemplate their exclusion, at least without sufficient justification,[23] this reference to exclusion is no longer appropriate.

 In sum, the Court holds that those class members who were not mental incompetents and who had not committed serious crimes in Cuba came to this country in response to an invitation from the President of the United States; that this invitation created for them a protected liberty interest in continued parole; and that because of this liberty interest, each of these class members may be detained only if a finding is made, pursuant to the procedures outlined at 567 F.Supp. 1129–45, that the person is likely to abscond, to pose a risk to the national security, or to pose a serious and significant threat to persons or property within the United States.[24]

## II. *International Law*

Plaintiffs also argue that their continued detention under the procedures applied to them violates customary international law and the U.N. Protocol Relating to the Sta-

---

is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.

103 S.Ct. at 1748 (footnote omitted) (quoting *Shango v. Jurich,* 681 F.2d 1091, 1100–01 (7th Cir.1982) ). *See also Harrah Independent School District v. Martin,* 440 U.S. 194, 197, 99 S.Ct. 1062, 1063, 59 L.Ed.2d 248 (1979) ("the Due Process Clause ... not only accords procedural safeguards to protected interests, but likewise protects substantive aspects of liberty against impermissible governmental restrictions") (construing fourteenth amendment's due process clause).

**22.** The Supreme Court reiterated this holding last term in *Cleveland Board of Education v. Loudermill,* — U.S. ——, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985).

**23.** Presently at issue is the *detention* of plaintiffs. The liberty interest created by the invitation also appears broad enough to impose limitations on the *exclusion* of plaintiffs from this country. That issue, however, is not before the Court at this time.

**24.** Even if the Status Review Plan were to be re-activated, "hearings" under the Plan would not provide the due process to which the liberty interest entitles these plaintiffs who were invited. The government has never taken the position that the panels conducting reviews under the Status Review Plan were impartial. Thus, their proceedings bore more resemblance to an interview than to a hearing.

tus of Refugees.[25] Because expert testimony is an acceptable method of determining international law, *see Restatement of the Foreign Relations Law of the United States (Revised)* § 133 (Tent. Draft No. 1, 1980), the Court conducted an evidentiary hearing and heard expert testimony from Professor Louis Henkin of Columbia University[26] and Professor Harold G. Maier of Vanderbilt University.[27]

Even the government admits that customary international law of human rights contains at least a general principle prohibiting prolonged arbitrary detention. The government maintains, however, that international law does not apply here because 8 U.S.C. § 1227(a) and the "highest levels of government" approve plaintiffs' indefinite detention. Defendants' Memorandum in Support of Motion for Denial of Writ of Habeas Corpus on the Issues of International Law at 9. Thus, the Court first must determine whether plaintiffs can resort to international law in challenging their detention.

In *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), the Supreme Court described the basic principles governing the application of customary international law in United States courts:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly present-

ed for their determination. For this purpose, *where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations,* and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*Id.* at 700, 20 S.Ct. at 299 (emphasis added). Thus, according to *The Paquete Habana*, plaintiffs can rely on customary international law only if "there is no treaty and no controlling executive or legislative act or judicial decision." *Id.*

 The Court finds no "controlling legislative act" that would preclude the application of customary international law here. The statute that the government argues is "controlling"—8 U.S.C. § 1227(a), which is denoted "Immediate deportation of aliens excluded from admission or entering in violation of law"—does not expressly address indefinite detention. Although that statute does not restrict the Attorney General's discretion in detaining excludable aliens,[28] it expresses no clear intent by

---

**25.** The Court will not address the merits of plaintiffs' argument that relies on the Protocol because it has determined above that claims based on plaintiffs' status as applicants for asylum are no longer appropriate for class-wide treatment. *See Garcia-Mir v. Smith,* 766 F.2d at 1492.

**26.** Professor Henkin is co-director of the Columbia University Center for the Study of Human Rights. He also serves as chief reporter for the American Law Institute's *Restatement of the Foreign Relations Law of the United States (Revised)* and as president of the United States Institute of Human Rights. He has authored several books and articles in the field of international law, including *How Nations Behave: Law and Foreign Policy* (1979); *The Rights of Man Today* (1978); and *Foreign Affairs and the Constitution* (1972); and he is considered an authority in the field of international law.

**27.** Professor Maier has been Director of the Transnational Legal Studies Program at Vanderbilt University since 1973. He has served as a consultant and counselor on international law to the U.S. State Department, and he has testified before Congressional committees concerning immigration and other international issues. Professor Maier is also the author of numerous works in the field of international law.

**28.** This Court previously has held that the statute itself, 8 U.S.C. § 1227(a), does not restrict the Attorney General's authority to detain excludable aliens indefinitely, and the Eleventh Circuit Court of Appeals has agreed. *See Fernandez-Roque v. Smith,* 567 F.Supp. at 1124–25, *rev'd on other grounds,* 734 F.2d at 580 n. 6. As noted above, neither this Court nor the Court of Appeals has considered whether international law places any restrictions on plaintiffs' deten-

Congress to authorize a type of detention that would contravene customary international law. Relying on the principle that, whenever possible, statutes should not be construed to violate international law, courts have demanded such an expression of clear intent before concluding that Congress intended to supersede international law. *See Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch) 102, 118, 2 L.Ed. 208 (1804); *Commodity Futures Trading Commissioner v. Nahas,* 738 F.2d 487, 493 (D.C.Cir.1984).

 The Court, however, finds that a "controlling executive act" may exist here. Plaintiffs argue that for an act of the executive to be considered "controlling," "it must involve an act taken by the President acting under his constitutional authority or expressly sanctioned by him." Plaintiffs' March 12, 1985 Brief at 24 (citing *Restatement (Revised)* § 131 comment c (Tent. Draft No. 1, 1980)). The Court, however, has carefully reviewed the authority cited by plaintiffs and has found no such distinction in the revised *Restatement* between acts of the President and acts of senior executive officials such as the Attorney General, who has directed plaintiffs' indefinite detention. Plaintiffs have cited no other authority supporting their proposed construction of the phrase "controlling executive act." Absent such authority, this Court is reluctant to hold that the Attorney General's involvement in plaintiffs' detention cannot be considered a "controlling executive act," especially since Congress has delegated to the Attorney General broad discretion over the detention of unadmitted aliens. *See* 8 U.S.C. § 1227(a). Ac-

cordingly, the Court concludes that plaintiffs have not established that customary international law applies in this case.

 It should be noted, however, that the indefinite detention of plaintiffs, without periodic hearings establishing that the continued detention of each class member is reasonably necessary for early deportation or for the protection of society from one proven to be dangerous, appears to violate customary international law. Relying on several international human rights agreements,[29] plaintiffs established that customary international law prohibits prolonged arbitrary detention.[30] Plaintiffs' expert, Professor Henkin, testified that "arbitrary" detention under international law is determined according to what is reasonable and fair under the circumstances, specifically by reference to the purpose, length, and conditions of detention. He stated that in the immigration context, international law recognizes only two legitimate purposes of detention: (1) to deport and (2) to protect society from those who pose a danger to it.

 Adopting Professor Henkin's view, if the Court were applying customary international law here, the Court would hold that customary international law requires the type of periodic, individualized hearings mentioned above. As already noted, however, the President has the authority to ignore our country's obligations arising under customary international law, and plaintiffs have failed to establish that the Attorney General does not share in that power when he directs the detention of unadmitted aliens. Accordingly, customary international law offers plaintiffs no relief in

tion. *See* 567 F.Supp. at 1128 n. 5; 734 F.2d at 582 n. 10.

29. Among the various international instruments on which plaintiffs rely are the 1948 Universal Declaration of Human Rights (Articles 9 and 13(1) ), the 1966 International Covenant on Civil and Political Rights (Article 9(1) ), the 1969 American Convention on Civil Rights (Articles 5(3), 7(1), and 7(3) ), and the 1950 European Convention for the Protection of Human Rights (Article 5(1) ). Other Courts have regarded the same or similar international agreements as sources of rules of customary international law.

*See Filartiga v. Pen-Irala,* 630 F.2d 876 (2d Cir. 1980); *Fernandez v. Wilkinson,* 505 F.Supp. 787 (D.Kan.1980), *aff'd on other grounds,* 654 F.2d 1382 (10th Cir.1981).

30. Plaintiffs find further support for their contention in the revised *Restatement,* which provides that "[a] state violates international law if, as a matter of state policy, it practices, encourages, or condones ... prolonged arbitrary detention." *Restatement (Revised)* § 702(e) (Tent. Draft No. 3, 1982).

this forum. Any relief in this area must come from the President, the Attorney General, or Congress.

## SUMMARY

In sum, the Court holds that those plaintiffs who were not mental incompetents and who had not committed serious crimes in Cuba have a federally-created liberty interest in continued parole because they came to this country in response to an invitation from the President of the United States. Consequently, each of these class members is entitled to a hearing, pursuant to the procedures outlined at 567 F.Supp. at 1129–45, at which his continued detention must be justified by a finding that he is likely to abscond, to pose a risk to the national security, or to pose a serious and significant threat to persons or property within the United States. The Court further holds that this liberty interest does *not* extend to those plaintiffs who were mental incompetents or who had committed serious crimes in Cuba.

The Court also holds that even though plaintiffs' continued indefinite detention appears to violate the customary international law prohibition of prolonged arbitrary detention, plaintiffs have failed to establish that customary international law applies in this case.

The government is DIRECTED to file within thirty days from the date of this order a plan providing those plaintiffs who have been determined to have a federally-created liberty interest the hearings to which that interest entitles them. Plaintiffs shall have fifteen days thereafter to respond, and the hearings shall begin no later than sixty days from the date of this order.